## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMERICAN EUROPEAN INSURANCE COMPANY, ANITA SALBERG and FAMILY ESTATES DEVELOPMENT COMPANY INC., individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>MEADOWBROOK INSURANCE GROUP, INC., ROBERT S. CUBBIN, and KAREN M. SPAUN,<br><br>      Defendants. | **13 Civ. 5748 (KPF)**<br>**13 Civ. 7094 (KPF)**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Co-Lead plaintiffs American European Insurance Company, Anita Salberg and Family Estates Development Company Inc. ("Lead Plaintiffs" or "Plaintiffs"), by their undersigned counsel, bring this federal securities class action pursuant to §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired the common stock of Meadowbrook Insurance Group, Inc. ("Meadowbrook" or the "Company"), between February 17, 2009 and February 21, 2014, inclusive (the "Class Period").

The allegations herein are based upon Plaintiffs' knowledge as to themselves, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiffs' counsel, which included, among other things, a review of the Company's public documents, press releases, filings with the United States Securities and Exchange Commission ("SEC"), and filings with the Michigan Department of Insurance and

Financial Services; wire and media reports published regarding Meadowbrook; securities analysts' reports and advisories about the Company; transcripts of Meadowbrook investor conference calls; interviews with former employees of the Company and other information publicly available or readily obtainable on the Internet.   Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiffs assert the claims set forth herein against Defendants Meadowbrook, Meadowbrook's President and Chief Executive Officer, Robert S. Cubbin ("Cubbin") and its Chief Financial Officer, Karen M. Spaun ("Spaun").   Defendant Meadowbrook and the Individual Defendants are collectively referred to herein as the "Defendants."

## NATURE OF THE ACTION

1.     Meadowbrook is an insurance holding company headquartered in Michigan, which, through its subsidiaries, provides commercial insurance products and services to various industries and to individuals throughout the United States.  Most of its revenues are derived from the premiums earned on policies its subsidiaries underwrite.   The Company generated approximately $944 million in gross written premiums and $790 million in total net revenues in 2013.

2.     Meadowbrook's emergence as a large-scale insurance company was the product of an aggressive acquisition and growth strategy, which Defendants accelerated in 2007. Between 2008 and 2011, Meadowbrook doubled in size, rapidly expanding net earned premiums from $369.7 mm in 2008 to $747.6 mm in 2011.  Likewise, for the years ended 2008, 2009, 2010, the Company reported increasing net operating income of $38.8 million, $53.5 million, and $58.2 million, respectively.

3.     Throughout the Class Period, Defendants attributed Meadowbrook's success to a "balanced approach," "conservative investment philosophy," and "disciplined underwriting, claims handling and reserving," which enabled the Company to deliver "predictability and profitability." From all outward appearances, Meadowbrook's growth and acquisition strategies seemed to be paying off.

4.     However, unbeknownst to investors, Meadowbrook's stellar financial results were the product of a fraudulent scheme in which Defendants deliberately and recklessly manipulated loss reserves and surplus in order to boost Meadowbrook's net income and make the Company appear more profitable. At the same time, Defendants' accelerated growth in premiums increased potential liabilities and exposure to risk. As a result, Meadowbrook's reserves and surplus bore little relation to the Company's actual risk profile. Lacking proper internal controls to detect and correct these deficiencies, Meadowbrook was anything but the "balanced," "conservative," and "disciplined" insurance company portrayed by Defendants.

5.     Establishing appropriate loss reserves is vital for an insurance company like Meadowbrook, because such reserves have a significant impact on reported operating results and financial condition. For every dollar Meadowbrook uses to establish a loss reserve, it is required to deduct one dollar from its operating income. Thus, when Meadowbrook failed to establish proper loss reserves, it misrepresented and overstated its net income and stockholders' equity while understating its liabilities. Had Meadowbrook set loss reserves at adequate levels, it would have been required to reduce operating income and surplus in each reporting period in which an inadequacy was identified, which would have revealed to investors that the Company was highly leveraged and not nearly as profitable or stable as Defendants claimed.

6.     Nevertheless, Defendants repeatedly assured investors that the Company performed "complete and detailed reserve analyses each quarter" and monitored business results "on a granular level" to ensure that reserves were established at adequate levels.  But Defendants failed to disclose that this "granular" analysis was based on false assumptions and ignored key financial metrics, which warned that premiums were outpacing recognition of reserves and that the Company was inadequately capitalized in the event of significant claims, especially in newer, riskier lines of business, such as workers' compensation and commercial auto liability.

7.     Defendants further bolstered Meadowbrook's financial results by improperly reversing and releasing into earnings loss reserves that had been established in prior years or had been inherited from acquisitions for the purpose of managing earnings results.  In this way, Defendants directly increased pre-tax net operating income by a materially large percentage, effectively inflating Meadowbrook's publicly reported earnings during this period.  In fact, from 2008 through 2010, the siphoning of loss reserves from prior accident years materially impacted earnings by an astonishing ***$76.5 million*** (2008: $16.8 million; 2009: $28.7 million; 2010: $31.0 million) or an average during that three year period of ***36% of the Company's pre-tax net operating income***.  By manipulating loss reserves and earnings in this way, either releasing reserves from older accident years or inadequately increasing reserves for new policies, Defendants artificially increased Meadowbrook's stock price throughout the Class Period.

8.     According to the Company's own estimates, by the second quarter of 2011, Meadowbrook was materially under-reserved for the true risk of claim losses by at least $120 million.  *See*, *infra*, ¶¶81-82.  Not surprisingly, the Company's adverse claims experience began to impact the manipulated, artificially low level of loss reserves that had supported the prior years' reported high level of profits, and Defendants' scheme to inflate earnings began to

unravel.  Defendants were forced to reverse course and increase loss reserves, but initially, did so in minimal amounts to reassure the investment community and A.M. Best Company ("A.M. Best") that management had not lost control of the business.  Thus, the Company took loss reserve charges that started low but increased dramatically as time progressed - $7.7 million, $10.2 million, $28.2 million, and $42.9 million, respectively, in Q4 2011 and Q1, Q2 and Q3 2012.

9.     On October 19, 2012, one day after Meadowbrook announced its sixth consecutive and largest quarterly loss reserve charge, A.M. Best placed Meadowbrook's "A-Rating" under review with negative implications (which implied a rating action was imminent). After the Company's credit rating was put under review, its shares fell $1.61 per share (or over 20%) to close at $6.18 per share on October 19, 2012.

10.     That same day, Defendants held a conference call to discuss the impact of the increase in net loss estimates for Q3 2012 and correspondingly large $42.9 million expense/loss reserve charge.  During the call, Defendants revealed that the Company had launched a new "initiative" to identify its largest claim exposures.  The initiative, referred to as the "Top Ten Exposure" program, required claim adjusters to report their "Top Ten Exposure" claims to their managers.  Managers then presented their top ten exposure lists up the line to corporate claims. Eventually, 750 claims were escalated to the corporate claims department.

11.     Defendants attempted to use the "Top Ten Exposure" program as a convenient cover story to conceal their manipulation of reserves and artificial inflation of earnings, claiming that the "unintentional effect" of the Top Ten Exposure Program was an acceleration in the Company's loss reserves.  In reality, the "Top Ten Exposure Program" merely brought to light Defendants' manipulation of loss reserves in prior periods and the lack of adequate internal

controls for setting reserves in the first place.   If the top claims initiative caused the "acceleration" in the Company's reserves, it was only because the Company failed to implement appropriate and adequate procedures for identifying higher exposure claims in prior periods.   The effect of such inadequate controls was that the reserves were fabricated, manipulated, and the very opposite of reserves established by "disciplined underwriting and claims handling."

12.    During 2012, Meadowbrook's stock price fell from a high of $11.87 to a low of $5.27.  Once again, Defendants scrambled to avoid disaster by realizing capital gains through a sale of a portion of Meadowbrook's bond portfolio and by retaining a consultant to assist in reviewing a variety of statutory capital enhancement strategies.   On December 20, 2012, desperate to bolster its capital position, Meadowbrook entered into a "quota-share" reinsurance agreement with SwissRe, pursuant to which SwissRe agreed to pay a share of the claims incurred by Meadowbrook, in exchange for Meadowbrook's ceding to Swiss Re approximately $90–100 million of unearned premium in 2012 and a $90-100 million of written premium in 2013. Meadowbrook's need for additional capital was a direct result of Defendants' manipulation of earnings through the use of reserves, which left statutory surplus at insufficient levels based on the growth in net premiums.

13.    Meanwhile, Defendants continued under-reserving loss liabilities.  Following the Swiss Re deal, Meadowbrook added only a *de minimus* $4.2 million for Q4 2012, and only $3.6 million for Q1 2013.  Defendants repeatedly assured investors that the adverse loss experience recognized in the prior year was an anomaly, stating that "[w]e're comfortable with where we've set the ultimate reserves" and that the reserve process had "stabilized."  Defendants confidently declared that the Company's prospects for positive growth and profitability had not changed.

14.     Defendants' subterfuge temporarily worked.   After October 2012, Defendants continued under-reserving loss liabilities to publicly justify a purported return to profitability. With these inadequate loss reserve additions, Meadowbrook was able to report favorable results, as forecast, for Q1 2013, thus deceiving the market that its problems had been temporary and that it was getting stronger and more profitable.   The capital enhancements strategies, in conjunction with Defendants' false and misleading assurances that reserves were now properly strengthened also persuaded A.M. Best to lift the Company's adverse status and halted the fall in Meadowbrook's stock price.   As a result, the price of Meadowbrook stock artificially headed back up and exceeded $8.00 per share by July 2013.

15.     By the end of 2012 and through the close of the Class Period, Defendants continued to conceal the weak financial condition and deteriorating claims experience of the Company. Defendants repeatedly assured securities analysts and investors that Meadowbrook's loss reserves were accurate, conservative, and had stabilized.   Defendants continued to tout the Company's system for properly monitoring its business results and its culture of disciplined claims handling and appropriate maintenance of loss reserves.

16.     Moreover, Defendants prepared financial statements, including cash flow forecasts, which were knowingly or recklessly overstated.   In particular, in the Fall of 2012, Defendants failed to incorporate realistic future business prospects in Meadowbrook's forecasts to avoid a determination that the substantial amount of goodwill on its balance sheet, exceeding $121.0 million since the acquisition of ProCentury Corporation ("ProCentury"), was impaired and would have to be written down.   A.M. Best had explained in its press release of October 19, 2012, that a downgrade of Meadowbrook's rating was reasonably likely based on a reduction in the Company's "earnings prospects going forward."   Defendants thus had a strong motive to take

risky measures to reverse this perception so as to avoid the threatened ratings downgrade and to forestall the steady deterioration of the Company's business.

17.     Had Defendants properly prepared the Company's financial forecasts, Meadowbrook would have been forced to recognize impairment of its goodwill and to take both a charge to the carrying value of that goodwill as an asset on its balance sheet and as a major component of the Company's reported net worth, and a corresponding reduction in stockholders' equity. Such a goodwill write-down would have exacerbated and accelerated the steady financial decline that Defendants had successfully masked in late 2012, revealing the true financial condition of the Company to the market. The fact that an impairment of goodwill would have led to a breach of loan covenants in Meadowbrook's credit agreements, thus damaging its banking relationships and making it even more difficult for Defendants to resolve their capital management problems, further evidences Defendants' motives in perpetuating this fraud.

18.     The truth was partially revealed on July 30, 2013, when the Company unexpectedly announced an additional, large Q2 2013 loss reserve charge of $26.5 million and the discontinuance of a territory in the Company's California Workers' Compensation business line.  In response to that announcement, A.M. Best downgraded the Company's credit rating.  On the news of the A.M. Best downgrade, Meadowbrook common stock declined 11%, or $0.80 per share and closed at $6.74 per share on August 5, 2013.

19.     On August 14, 2013, after reporting years of unchanged goodwill following the ProCentury acquisition, the Company announced that it would take a $115.4 million non-cash impairment of goodwill in the three months ended June 30, 2013.  The impairment charge wiped out 95% of the Company's goodwill on its balance sheet and caused Meadowbrook to violate net worth financial covenants applicable to its bank credit facility.  On the news of Meadowbrook's

impairment charge the Company's shares fell $0.20 per share, or 3% to $6.36 per share on August 15, 2013.

20.     On February 18, 2014, Meadowbrook issued a press release reporting on the Company's Q4 2013 and year-end 2013 results.  Despite falsely informing the investing public that its reserve issues had stabilized, once again, the Q4 2013 results included a pre-tax increase in net ultimate loss estimates of $31.4 million. Following the release of the Company's Q4 2013 results, on February 21, 2014, A.M. Best downgraded Meadowbrook again.  On the news of Meadowbrook's $31.4 million expense/loss reserve charge the Company's shares fell $0.13 per share to $5.35.

21.     In total, as a result of Defendant's fraudulent scheme, between Q4 2011 and continuing through year end 2013, the Company was forced to increase its net loss reserves by approximately *$161.2 million* (2013:   $68.4 million; 2012:   $85.5 million and 2011:   $7.3 million) for accident years 2012 and prior.

22.     Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material facts concerning, *inter alia*: (1) the inadequacy of Meadowbrook's loss reserves and surplus based upon the Company's liabilities and future claims; (2) the extent to which the Company's earnings were manipulated by maintaining reserves and surplus at unsustainable levels; (3) Meadowbrook's financial reporting and its failure to comply with Generally Accepted Accounting Principles ("GAAP"); (4) Meadowbrook's lack of internal controls and procedures in connection with underwriting, claims handling, and reserving; and (5) Meadowbrook's impairment of goodwill.

23.     As a result of Defendants' wrongful acts and omissions their improper manipulation and management of the Company's reserves and the precipitous decline in the

market value of the Company's common stock that following materialization of such fraudulent misconduct, Plaintiffs and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

24.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b) as the Company conducts business in this District, false statements were made in this District, and the acts giving rise to the violations complained of occurred from this District.

26.    In connection with the acts and omissions alleged in this Consolidated Amended Class Action Complaint ("Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

27.    Plaintiff American European Insurance Company ("AEIC") is a New Hampshire corporation headquartered in New Jersey.

28.    Plaintiff Anita Salberg is an individual who resides in New York.

29.     Plaintiff Family Estates Development Company Inc. ("FEDCI") is a subchapter S corporation and is owned equally by Melvin and Anita Salberg who are husband and wife and reside in New York.

30.     By order dated January 31, 2014, plaintiffs AEIC, Anita Salberg and FEDCI were appointed as Lead Plaintiffs in accordance with the provisions of the Private Securities Litigation Reform Act of 1995.  Lead Plaintiffs' certifications were previously filed with the Court.  Lead Plaintiffs purchased Meadowbrook common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

**Defendants**

31.      Defendant Meadowbrook is a Michigan corporation with its headquarters located at 26255 American Drive, Southfield, Michigan 48034.  The Company's common stock is listed on the NYSE, an efficient market, under the ticker symbol "MIG" and, as of February 21, 2014, the Company had more than 49 million shares of its common stock outstanding.

32.     Defendant Cubbin is, and was at all relevant times, the Company's President and Chief Executive Officer.  Cubbin began his career in 1983 as a legal associate at the Detroit, Michigan law firm of Plunkett Cooney, where he specialized in insurance defense and coverage litigation, as well as insurance regulatory and captive formation matters.  In 1987, he joined Meadowbrook as Vice President and General Counsel, where he was primarily responsible for all legal and regulatory affairs relating to the Company.  He was promoted to Executive Vice President in 1996 where he was responsible for legal, regulatory and claims, and he was appointed to President and Chief Operating Officer in 1999, where he was primarily responsible for all operational functions within the Company.  Mr. Cubbin has been a director of the

Company since 1995 and, in May 2002, he was appointed as the Company's President and Chief Executive Officer.  In 1995, Cubbin was part of the team that took Meadowbrook public.

33.    Defendant Spaun is, and was at all relevant times, the Company's Senior Vice-President and Chief Financial Officer.  Spaun joined Meadowbrook in 1998, as Director of Investor Relations, and has also held the position of Vice President of Finance & Accounting.  In May of 2002, she was named Senior Vice President, and Chief Accounting Officer.  In May of 2003, she was named Chief Financial Officer.  Spaun began her professional career at Coopers & Lybrand (now PricewaterhouseCoopers) as an auditor. She later held the position of Director of Financial Accounting at Citizens Insurance Company of America, where she specialized in financial reporting, including both SEC and statutory reporting.  Prior to joining Meadowbrook, Spaun was Controller at First Mercury Financial Corporation.

34.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false and misleading information conveyed in Meadowbrook's public filings, press releases and other group-published documents addressed herein reflect the collective work of the Individual Defendants.  Each of the Individual Defendants, by virtue of his or her position with the Company, was a corporate insider, directly participated in the day-to-day operations and affairs of the Company at the highest levels, and was privy to confidential proprietary information regarding the Company and its business operations, products, growth, financial statements and financial condition, as alleged herein. During the Class Period, the Individual Defendants were involved in the drafting, preparation, review and/or dissemination of the various public statements, shareholder and investor reports, and other communications which contained the materially false and misleading information alleged herein and were aware of, or recklessly disregarded, that materially false and misleading

statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. The Individual Defendants signed numerous materially false statements filed with the SEC, as well as accompanying certifications under the Sarbanes-Oxley Act of 2002 ("SOX").

35.     Throughout the Class Period, Defendants Cubbin and Spaun, were responsible for ensuring the accuracy of Meadowbrook's public filings and other public statements, and they personally attested to and certified the accuracy of Meadowbrook's financial statements.  During the Class Period, the Individual Defendants participated in preparing, reviewing, approving and/or certifying consolidated financial statements for Meadowbrook that purported to conform with applicable regulatory requirements and GAAP.  These financial statements were filed with the SEC, and disseminated to the public, through *inter alia*, Company press releases, reports on Form 8-K, quarterly reports on Forms 10-Q and annual reports on Forms 10-K, and in other communications with investors, credit rating agencies, bank lenders and securities analysts. The financial information contained therein misrepresented that Meadowbrook's financial statements were accurate.

36.     The Individual Defendants were aware of, or recklessly disregarded, the misstatements contained in the SEC filings, press releases and other public statements complained of herein, and their materially false and misleading nature.  Because of their executive and managerial positions, each of the Individual Defendants had access to the materially adverse, undisclosed information about Meadowbrook and its financial condition and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the representations made by them or Meadowbrook materially false and misleading.

37.     As officers and/or directors and controlling persons of a publicly held company the common stock of which was, and is, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which was and is governed by the provisions of the federal securities laws, and as the persons signing the SEC filings at issue and accompanying SOX certifications, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, loss reserves, goodwill, goodwill impairment, and present and future business prospects, and to correct any previously issued statements that were known to have become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  As alleged herein, the Individual Defendants violated these duties.

38.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein.  Each Individual Defendant participated in the drafting and revision of the documents alleged herein to be misleading and was thereafter provided with copies of such documents prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the SEC filings, press releases and other public statements detailed herein and is therefore liable for the misrepresentations and omissions contained therein.

39.     As alleged herein, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading,

deliberately contrived and knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Meadowbrook, their control over and receipt or modification of Meadowbrook's allegedly materially misleading statements, and their associations with the Company which made them  privy to confidential proprietary information concerning Meadowbrook, directly participated in the fraudulent scheme alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Meadowbrook's Business

40.     Meadowbrook is an insurance holding company based in Southfield, Michigan and transacts the majority of its business through several of its subsidiaries, which include Star Insurance Company ("Star"), ProCentury, Meadowbrook Inc., and Crest Financial Corporation. Star's wholly-owned subsidiaries include Ameritrust Insurance Corporation ("Ameritrust"), Savers Property and Casualty Insurance Company ("Savers"), and Williamsburg National Insurance Company ("Williamsburg").   ProCentury's wholly-owned subsidiaries include Century Surety Company ("Century"), ProCentury Insurance Company ("PIC"), and ProCentury Risk Partners Insurance Company ("Propic").

41.     Through its subsidiaries, Meadowbrook provides commercial insurance products and services to various industries and to individuals throughout the United States.  The Company markets and underwrites specialty property and casualty insurance products on both an "admitted" and "non-admitted" basis through a broad and diverse network of independent retail agents, wholesale program administrators and general agents.  Insurance companies providing

insurance policies on an "admitted basis" are required to be licensed by the states in which they sell policies and to offer policies using premium rates and forms that are filed with state insurance regulators.  Insurance companies providing insurance on a "non-admitted basis" operate without submitting to state requirements.

42.     Meadowbrook categorizes its products as follows:  (i) Admitted Programs and Standard Market Products (*e.g.*, coverage for the food service industry, educators, and agriculture); (ii) Main Street Excess and Surplus Lines (*e.g.*, coverage for restaurants, bars/taverns, apartments, hotels/motels, and contractors' liability); (iii) Non-Admitted Programs (*e.g.*, coverage for pet-sitters, oil and gas contractors, and professional liability); and (iv) Specialty Market Products (*e.g.*, the excess workers' compensation, environmental, and marine markets).  As explained in more detail below, the Main Street Excess and Surplus Lines were acquired as part of the ProCentury acquisition.  The Main Street Excess and Surplus Lines market provides insurance coverage for customers with hard-to-place risks that standard or admitted insurers typically choose not to insure.

43.     The majority of Meadowbrook's revenues are derived from net earned premiums, which are diversified by line of business, customer, type of distribution and geography.  The Company reports and presents its results through five different lines of business: (1) Workers' Compensation, (2) Residual Markets, (3) Commercial Multiple Peril/General Liability, (4) Commercial Automobile, and (5) Other.

**Meadowbrook's Acquisition Strategy**

44.     Meadowbrook's emergence as a large-scale insurance holding company is the product of an aggressive growth strategy, which Defendants accelerated in 2007.  The buying spree began in April 2007, when Meadowbrook acquired U.S. Specialty Underwriters, Inc. ("USSU") for a purchase price of approximately $23.0 million.  At the time of the acquisition,

the Company stated that the USSU acquisition provided "growth for our fee-based operations" and "complements our existing public entity excess workers' compensation program."

45.   Goodwill associated with the USSU acquisition in 2007 was approximately $12.0 million.   In addition, the Company recorded an increase to other intangible assets of approximately $9.5 million.   These other intangible assets related to customer relationships acquired with the acquisition.   In 2008, as a result of the USSU acquisition, the Company recorded an additional increase to goodwill of approximately $16.0 million and an increase to other intangible assets of approximately $4.9 million.

46.   During the fourth quarter 2007, the Company purchased a book of business for an excess liability and workers' compensation program for public entities.   The total purchase price consisted of $7.5 million recognized as other intangible assets.

47.   Consistent with its growth-by-acquisition strategy, on February 20, 2008, Meadowbrook and ProCentury announced that they had executed a definitive merger agreement for a transaction valued at approximately $272.6 million. As part of the ProCentury acquisition, Meadowbrook reported that its goodwill increased from $43.4 million (for the period ending December 31, 2007) to $108.6 million (for the period ending September 30, 2008).  The majority ($59.5 million) of the increase in goodwill was a result of the ProCentury merger.  The Company issued a press release, which explained that the purpose of the ProCentury acquisition was to "expand and complement Meadowbrook's specialty lines capabilities with ProCentury's insurance professionals and product expertise in the [E]xcess and [S]urplus [L]ines market."

48.   Prior to the acquisition, ProCentury had a history of setting consistent and adequate loss reserves.  During the February 21, 2008 Investor Call, one of Meadowbrook's shareholders asked specifically about the adequacy of ProCentury's reserves:

Q:      Yes, thank you, gentlemen. I have a question relative to reserves. There was no discussion whatsoever as to ProCentury's reserves. How adequate to you feel they are, and why?

A:      Robert, this is Bob Cubbin. During the due diligence process, we worked with their actuaries and analyzed the position that they are in, and we got comfortable with their reserve position. They have had some fairly consistent favorable reserve development. We were satisfied with the review that we did that the reserves are in a very reasonable range and appear to be conservatively set.

49.      On February 27, 2008, A.M. Best maintained Meadowbrook's financial strength rating of A- (Excellent) as a result of the planned merger with ProCentury.

50.      On June 27, 2008, Meadowbrook issued a press release and announced that it had received financing commitments totaling $85.0 million to its proposed $100.0 million senior credit facilities.  On July 31, 2008, the Company executed $100 million in senior credit facilities (the "July 2008 Credit Facility").  The debt financial covenants applicable to the July 2008 Credit Facility consisted of: (1) minimum consolidated net worth starting at eighty percent of pro forma consolidated net worth after giving effect to the acquisition of ProCentury, with quarterly increases thereafter, (2) minimum Risk Based Capital Ratio for Star of 1.75 to 1.00, (3) maximum permitted consolidated leverage ratio of 0.35 to 1.00, (4) minimum consolidated debt service coverage ratio of 1.25 to 1.00, and (5) minimum A.M. Best rating of "B++." The ProCentury Merger closed on July 31, 2008.

51.      In 2009, the Company continued to expand its business by forming a new relationship with a program agent who specialized in non-contractors workers' compensation in the Midwest, California, and other western states.  The Company also launched additional new programs through other agents focusing on the food service industry and workers' compensation in the Southeast.

52.     Defendants' growth strategy appeared to pay off.   Between 2008 and 2011, Meadowbrook doubled in size, as net earned premiums expanded from $369.7 mm, $539.6 mm, $659.8 mm, and $747.6 mm in 2008, 2009, 2010, and 2011, respectively.   Much of this growth in premiums was concentrated in the workers' compensation line of business and in California. In particular, workers' compensation grew from approximately $109 mm in net earned premiums, or 29.57% of total net earned premiums, in 2008 to $314.8 mm in net earned premiums, or 41.94% of total net earned premiums, in 2011.   As of 2013, Workers' Compensation comprised approximately 48.4% of the Company's business.   Similarly, whereas approximately 18.5% of the Company's business (as measured by gross written premiums) was focused in California in 2008, California business comprised approximately 33% of gross written premiums by 2011.

53.     Simultaneous with this rampant growth, Meadowbrook also reported increases in revenue and net income.   For the years ended 2008, 2009, 2010, the Company reported total revenue of $437.8 mm, $627.6 mm, and $750.1 mm, and net operating income of $38.8 million, $53.5 million and $58.2 million, respectively.

**Accurate Loss Reserves And Adequate Internal Controls Are**
**Critical To Meadowbrook's Business**

54.     As an insurance company, Meadowbrook's success depends not only on finding revenue streams and growing premiums, but also on its ability to accurately assess and manage risk and estimate liabilities for the policies underwritten by its subsidiaries.   In many cases, significant periods of time can elapse between the occurrence of an insured loss, the reporting of the loss to Meadowbrook, and the Company's payment of that loss.   To recognize liabilities for the ultimate payment of all losses, insurers like Meadowbrook establish loss and loss adjustment expense reserves as balance sheet liabilities and income statement expenses representing

estimates of amounts that will be needed to be paid in the future.  For insurance companies, reserves are a critical, if not the most important, measure of financial health, as they represent expected future losses that the company will be required to pay out for claims on the insurance policies it has issued and underwritten.

55.     The establishment of reserves is meant to ensure that a sufficient portion of the premiums received in connection with a line of business will be available to cover the claims filed that relate to that line of business.  Loss reserves established by an insurer or reinsurer reflect the estimated cost of claims that the carrier will be required to pay in the future on insurance that has been written as of the date of the financial statements.  Loss reserves are for the losses, known or unknown, which have been incurred as of the financial reporting date on all policies active or expired.  They include an examination of reported but unpaid claims (called case reserves), estimates of claims not yet reported, estimates of closed claims which may be reopened, and estimates of the shortfall expected in case reserves, based on history, to reflect that even on reported claims, information is never complete until the claim is settled.  In order for the level of the reserves established in connection with a given group of policies to be adequate, the reserves must be based upon actuarial analysis of accurate underlying data concerning the nature of the claims filed (and expected to be filed) and the business lines (*i.e.*, workers' compensation, commercial multi-peril, etc.) associated with the claims.

56.     Calculating the appropriate level of reserves directly impacts Meadowbrook's financial reporting.  For every dollar Meadowbrook uses to establish a loss reserve, the Company is required to deduct one dollar from its operating income.  When Meadowbrook does not establish a proper loss reserve, or improperly reduces existing reserves that are required to adequately provide for losses on insured risks, it is misrepresenting and overstating its net

income and stockholders' equity while understating liabilities.  If any of Meadowbrook's loss reserves are inadequate, it is required to increase them, resulting in a commensurate reduction in net income in the period in which the inadequacy is identified.  Similarly, every dollar that Meadowbrook sets aside for loss reserves results in a decrease in surplus (*i.e.*, the extra amount or "cushion" that an insurance company has on hand after properly accounting for all assets and liabilities).  Loss reserves are thus a key metric that drives Meadowbrook's profitability.

**Defendants Assured Investors That Meadowbrook Employed A "Balanced Approach," "Conservative Investment Philosophy," And "Disciplined Underwriting, Claims Handling And Reserving" Process**

57.     Throughout the Class Period, Defendants represented that Meadowbrook was a profitable growth company that was adequately reserved and had effective internal controls and processes for underwriting, claims handling, and reserving.  Such representations allowed the Company to understate reserves by hundreds of millions of dollars and falsely report tens of millions of dollars of net income during the Class Period, thereby maintaining an artificially inflated stock price.

58.     With respect to underwriting, Defendants claimed that Meadowbrook adhered to a "disciplined" approach, which included, *inter alia*, "limit[ed] exposure to catastrophe-prone areas and purchase of reinsurance," associates with "broad and deep underwriting experience and expertise," "a thorough new business due diligence process," and "robust program controls [that] help monitor all programs for performance."

59.     With regard to reserving, Defendants provided a detailed explanation of its claim reserving process and methodology.  Specifically, Defendants explained that when a claim was reported to one of Meadowbrook's subsidiaries, "claims personnel within our risk management subsidiary will establish a case reserve for the estimated amount of the ultimate payment."  The amount of these reserves was based upon "a case-by-case evaluation of the type of claim

involved," and that that "these estimates are revised as deemed necessary by the responsible claims personnel based on subsequent developments, new information or periodic review of claims."

60.     In addition to case reserves, Meadowbrook also maintained reserves for presently unknown claims on existing policies, referred to as "incurred but not reported" losses ("IBNR"). IBNR expenses were purportedly determined using generally accepted actuarial reserving techniques.

61.     Defendants claimed that in developing case reserves and IBNR reserves, the Company "performed a complete and detailed reserve analyses each quarter," in which "data is organized at a 'reserve category' level," such as a line of business or particular geographical area.  Defendants assured investors that Meadowbrook studied "historical development patterns" and used "benchmarks based on industry data and forecasts made by industry rating bureaus," especially for new lines of business with insufficient historical data.  Thus, although establishing reserves "requires the selection and application of parameters and assumptions," investors were assured that the determination of reserves was neither arbitrary nor random, and that at all times, Defendants had the process under control.

**Defendants Understated Loss Reserves In Order To Hide**
**Meadowbrook's Growing Financial Risks**

62.     Despite Defendants' assurances, Meadowbrook was ill-prepared to handle the Company's rapid growth.   Eager to convince investors that their acquisition strategy had succeeded, Meadowbrook jumped head first into new, unfamiliar, and riskier lines of business, abandoning the detailed, methodical processes it touted for underwriting and establishing reserves.  At the same time, Defendants exploited the assets acquired from merged subsidiaries, particularly loss reserves, to further bolster profits.

63.     Numerous key financial metrics, which are critical in the insurance industry and which Defendants would have monitored throughout the Class Period, demonstrate that Defendants deliberately and/or recklessly ignored warning signs and other indications that Meadowbrook was under-reserved and under-capitalized.

### a.   Premiums Outpaced Growth In Reserves

64.     While Meadowbrook was underwriting more policies in new and unfamiliar lines of business, and therefore, exposing the Company to increased liability for new claims based upon those polices, the Company failed to adjust loss reserves in proportion to this exponential growth in premiums.   Indeed, despite the Company's altered risk profile, the ratio of total reserves to net earned premiums actually *declined* by a total of 30.8% from 2008 through 2011, as illustrated below:

| | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Total Reserves (in millions) | $625.3 | $682.4 | $784.2 | $879.1 |
| % change Total Reserves (year-to-year) | | 9.1% | 14.9% | 12.1% |
| Net earned premiums (in millions) | $369.7 | $539.6 | $659.8 | $747.6 |
| % change Net earned premiums (year-to-year) | | 46% | 22.3% | 13.3% |
| Ratio of Reserves/Premiums | 1.69 | 1.26 | 1.18 | 1.17 |
| % change Total Reserves/Premiums (year-to-year) | | 25.4% | 6.3% | 0.8% |
| % change Total Reserves/Premiums (2008 to 2011) | | | | 30.8% |

65.     Because premium growth outpaced growth in reserves, the Company was able to report robust earnings – without disclosing that these results were attributable to Defendants' artificial suppression of reserves.

### b. Financial Ratios Showed Increasing Leverage And Increased Risk Exposure

66.     Throughout the Class Period, Defendants also would have tracked the growth in both gross and net premiums relative to statutory surplus.  For an insurance company, surplus acts as a backstop in the event that reserves fall short.  In other words, surplus is the extra capital over and above what the company needs in order to weather fluctuations in business.  Comparing premiums to surplus indicates the extent to which a company is prepared to cover losses based upon the amount of business that it is writing.  It also reflects on management's effectiveness in using capital and assuming risk.  Simply stated, premium to surplus ratios measure the company's leverage.

67.     For Meadowbrook, which was expanding into new lines of business with new agents without historical claims experience, the conservative and balanced approach touted by Defendants necessarily involved consideration of the Company's capitalization and preparedness to cover claims.  Nevertheless, between 2008 and 2009, and continuing thereafter, the ratio of gross written premiums (*i.e.*, total sales) to surplus suddenly spiked upward, deviating from both the Company's past experience as well as industry averages, as illustrated below:

|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Meadowbrook Insurance Group** | **2.5** | **2.3** | **2.9** | **2.9** | **2.5** | **2.5** | **4.0** | **4.3** | **4.5** | **4.9** | **4.0** |
| Donegal Insurance Group | 3.9 | 3.9 | 3.5 | 2.7 | 2.5 | 2.6 | 2.5 | 2.6 | 2.9 | 3.1 | 3.1 |
| National Interstate Ins Co. | 4.1 | 3.0 | 2.5 | 2.2 | 2.0 | 2.1 | 1.6 | 1.5 | 1.9 | 1.9 | 2.1 |
| Employers Holdings Inc. | 1.2 | 1.1 | N/A | 0.6 | 0.5 | 0.8 | 0.6 | 0.6 | 1.0 | 1.3 | 1.3 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AMERISAFE Combined Group | 2.4 | 2.5 | 2.2 | 1.9 | 1.5 | 1.2 | 0.9 | 0.7 | 0.9 | 1.0 | 1.1 |
| Baldwin & Lyons Group | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.6 | 0.8 | 0.9 | 1.2 | 1.2 | 1.1 |
| Hallmark Financial Services | 6.3 | 3.9 | 2.1 | 2.9 | 2.7 | 2.4 | 2.7 | 3.3 | 4.5 | 5.0 | 5.4 |
| United Fire Group Inc. | 2.5 | 2.1 | 2.0 | 2.1 | 1.7 | 1.6 | 1.5 | 1.4 | 1.6 | 2.1 | 2.2 |
| Tower Group International Ltd. | 3.9 | 3.2 | 2.6 | 2.4 | 2.5 | 2.8 | 4.8 | 4.8 | 4.8 | 5.3 | 7.0 |
| Navigators Group Inc. | 3.2 | 2.7 | 2.4 | 2.1 | 1.8 | 1.6 | 1.4 | 1.2 | 1.4 | 1.7 | 1.7 |
| **Peer Group Average** | **3.2** | **2.6** | **2.2** | **1.9** | **1.8** | **1.7** | **1.9** | **1.9** | **2.2** | **2.5** | **2.8** |

68.     This sudden and significant change in gross written premium to surplus reveals that Meadowbrook was expanding its business without corresponding increases in capital.  While the acquisition of ProCentury and other subsidiaries may have been a way to grow the Company, those mergers did not add sufficiently to surplus.   Had Defendants increased reserves in proportion to the increase in premiums – as they should have – it would have meant an even lower surplus and a higher premium to surplus ratio.  Thus, Defendants continued to manipulate reserves in order to conceal the Company's true financial condition and risks from under-capitalization.

69.     The ratio of net written premiums (*i.e.*, gross written premiums minus reinsurance) to surplus experienced similar changes:

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Meadowbrook Insurance Group** | **1.6** | **1.7** | **1.7** | **1.7** | **1.5** | **1.5** | **1.7** | **1.9** | **2.0** | **2.0** | **1.5** |

70.     The widening gap between gross written premiums to surplus as compared to net written premiums to surplus beginning in 2009 is due to Meadowbrook's increased reliance on reinsurance, which is directly related to the Company's rapidly growing premiums and greater risk exposure.   In fact, this disparity would have been understood by Defendants to mean that

Meadowbrook was becoming more leveraged and had less equity cushion in the event that claims deviated from expected patterns.

71.     However, Defendants deliberately and/or recklessly ignored these financial metrics, instead choosing to perpetuate the illusion that the Company was growing and profitable.  It was not until the end of 2012, when statutory surplus had fallen to dangerously low levels and began to attract the attention of regulators that Defendants were finally forced to take steps to restore these ratios to a balanced level and strengthen statutory surplus, and only then at the expense of the Company's shareholders.

### c.   *Reserves Deviated From Claims Experience*

72.     Contrary to Defendants' misrepresentations, an analysis of payments and reserves by line of business substantiates that Defendants abandoned the consistent, detailed reserve methodology described in their public filings and that Defendants were aware of reserve shortfalls throughout the Class Period.

73.     Specifically, an analysis of Meadowbrook's experience in its Commercial Auto Liability line shows that just as in other areas of Meadowbrook's business, premiums grew steadily between 2005 and 2012.  However, beginning in 2009, loss payments (*i.e.*, the amount that Meadowbrook was paying on claims) began to comprise an increasing percentage of premiums earned.  This served as a warning sign to Defendants that profitability on this line of business was beginning to deteriorate.  The chart below illustrates the payments and reserves as a percentage of earned premiums:



74.     As the chart illustrates, in 2010, the rate of payments to premiums increased from approximately 10% to approximately 12.5%.  This was the highest increase in payments relative to premiums that the Company had experienced since 2005, and the trend only continued.

75.     Despite this development in payments, reserve levels for commercial auto liability actually were booked **_lower_** relative to premiums, suggesting that even though they knew losses were coming in worse than expected, Defendants still determined that reserves were adequate. This disparity between reserves and payments is illustrated below:



27

76.    Even as the adverse trend on loss payments continued in 2011, Defendants made only slight increases to reserve levels.

77.    Furthermore, Defendants have been forced to acknowledge that these reserve levels were wholly inadequate.  According to the data in documents filed by Defendants with regulators, Meadowbrook's current estimates indicate that based on loss payments made at the time, there was a significant increase in reserve need from 2009 to 2010, with the trend continuing into 2011:



78.    The increase in reserve need in 2010, of which Defendants would have been aware at the time because of the historical data they possessed, represents approximately $15 million just for the commercial auto liability line of business.  In that same year, Meadowbrook reported $59.7 million in net income.  Similarly, reserves for commercial auto liability were booked short by $20 million in 2011.  Thus, had Defendants set reserves at sufficient levels for just this one line of business, the Company would not have been able to report these year-over-year profitable results and materially overstate net income.

79.     Moreover, the reserve inadequacies are evident in other lines of business as well. For example, reserves for workers' compensation follow a very similar pattern as reserve development for commercial auto liability:



80.     This high level of correlation of relative reserve strength and weakness over time between these lines of business is not a random occurrence.  Rather, this pattern, confirmed by analysis of data available to Defendants at the time reserves were established, indicates a systematic attempt to manage earnings by setting reserves at artificially low levels.  This conclusion is compelling because, as demonstrated below, the same pattern holds true for _**all**_ lines of business at Meadowbrook, and this analysis supports the inference that this pattern was consistent and intentional, not random fluctuation.  Moreover, although referred to in the industry as a "hindsight" analysis, the graph illustrates that at the time the inadequate reserves were booked, Defendants had information regarding payments, premiums, and reserves, which provided a clear indication of where reserves should have been booked but for managements' intentionally disregarding that data.

81.     Looking across all lines of business, by 2011, reserves were inadequate by approximately $120 million.  This represents approximately $150 million (when added to the approximately $30 million redundancy that existed in 2007-2008) of illusory pre-tax income (*i.e.*, amounts that should have been recorded as balance sheet liabilities instead of released into earnings) in the 2009 through 2011 period, as illustrated in the chart below:



82.     Given the Company's highly leveraged position, these reserve inadequacies misled investors as to the Company's profitability and stability and concealed its increasing exposure to risk.

### d. *Defendants Release Reserves From Prior Periods*

83.     Between 2008 and 2010, Defendants' intentionally manipulated Meadowbrook's loss reserves for all of its business lines by improperly releasing (*i.e.*, reducing) existing loss reserves in material amounts as set forth herein.  This process had a direct and materially positive impact on the Company's pre-tax net operating income and thus inflated Meadowbrook's earnings (because every dollar taken out of loss reserves could be booked as an additional dollar of earnings).

84. A summary of the quarterly impact on the Company's business lines is as follows:

- In the Company's Workers' Compensation business line, for 8 consecutive quarters, Meadowbrook benefited from a decrease in its loss estimates for prior years and a resulting decrease in existing reserves for losses on the Company's balance sheet. Specifically, the Company reported the following decreases in its ultimate loss estimates for its Workers' Compensation business: 1Q 2008: $1.5 million; 2Q 2008: $4.1 million; 3Q 2008: $7.7 million; 4Q 2008:  $12.7 million; 1Q 2009:  $1.9 million; 2Q 2009: $4.7 million; 3Q 2009: $6.3 million; 4Q 2009 $7.7 million.

- In the Company's Commercial Multiple Peril and General Liability ("CMPGL") business line, for 9 consecutive quarters, Meadowbrook benefited from a decrease in its loss estimates for prior years.  Specifically, the Company reported the following decreases in its  ultimate loss estimates for its CMPGL business:  1Q 2009:  $3.7 million;  2Q 2009: $5.7 million; 3Q 2009: $7.1 million; 4Q: 2009:  $9.4 decrease; 1Q 2010:  $6.2 million; 2Q 2010:  $9.1 million; 3Q 2010: $14.2 million; 4Q 2010: $20.7 million; 1Q 2011:  $4.8 million.

- In the Company's Commercial Automobile business line, for 11 quarters, Meadowbrook benefited from a decrease in its loss estimates for prior years.  Specifically, the Company reported the following decreases in its ultimate loss estimates for its Commercial Automobile business:  1Q 2008: $1.3 million;        2Q 2008: $1.4 million; 3Q 2008: $4.1 million; 4Q 2008:  $5.1 million;              2Q 2009: $0.3 million; 3Q 2009: $1.88 million; 4Q 2009 $4.0 million;              1Q 2010:  $1.8 million; 2Q 2010:  $4.8 million; 3Q 2010: $8.7 million; 4Q 2010: $9.9 million.

- In the Company's Residual Markets business line, for 13 consecutive quarters, Meadowbrook benefited from a decrease in its loss estimates for prior years. Specifically, the Company reported the following decreases in its ultimate loss estimates for its Residual Markets business:  1Q 2008: $0.9 million; 2Q 2008: $1.6 million; 3Q 2008: $2.2 million; 4Q 2008:  $2.7 million; 1Q 2009: $1.7 million; 2Q 2009: $2.3 million; 3Q 2009: $2.7 million; 4Q 2009 $3.5 million;     1Q 2010:  $1.2 million; 2Q 2010:  $2.2 million; 3Q 2010: $2.6 million;              4Q 2010: $3.2 million; 1Q 2011: $0.2 million.

- In the Company's other business lines, for 13 consecutive quarters, Meadowbrook benefited from a decrease it its loss estimates for prior years. Specifically, the Company reported the following decreases in its ultimate loss estimates for its other business lines: 1Q 2008: $0.8 million; 2Q 2008: $1.8 million; 3Q 2008: $3.6 million; 4Q 2008:  $3.4 million; 1Q 2009: $1.1 million; 2Q 2009: $1.6 million; 3Q 2009: $3.0 million; 4Q 2009 $3.8 million; 1Q 2010:  $1.8 million; 2Q 2010: $3.2 million; 3Q 2010: $3.0 million; 4Q 2010: $3.5 million; 1Q 2011: $2.8.

85.    With respect to the impact to the Company's earnings, from 2008 through 2010, the cumulative favorable development on prior years loss reserves released into earnings was

***$76.5 million*** (2008: $16.8 million; 2009: $28.7 million; 2010: $31.0 million) or an average during this three year period of ***36% of the Company's pre-tax net operating income***. The purported "favorable reserve developments" on Meadowbrook's pre-tax net operating income can be further broken down on an annual basis as follows:

- For the year ended December 31, 2008, the Company recorded a favorable development on prior years loss reserves of $16.8 million, which was 30% of its 2008 pre-tax net operating income of $55.2 million;

- For the year ended December 31, 2009, the Company recorded a favorable development on prior years loss reserves of $28.7 million, which was 39% of its 2009 pre-tax net operating income of $73.3 million.

- For the year ended December 31, 2010, the Company recorded a favorable development on prior years loss reserves of $31.0 million, which was 39% of its 2010 pre-tax net operating income of $79 million.

86.     By improperly releasing these prior reserves in substantial and material amounts, for three consecutive years the Defendants were able to artificially inflate the Company's net income, which had the effect of artificially increasing Meadowbrook's stock price. The scheme also improperly supported the continued maintenance of over $100 million in goodwill on the Company's books.   Defendants' fraudulent conduct allowed the Company to manage its earnings and net worth, inflate its combined ratio, maintain its loan covenants and credit rating and keep the Company's stock (which, as of January 3, 2011, was trading at $10.39 per share) at an artificially high price.

87.     This reserve manipulation directly contributed to the Company's artificially low combined ratio, a vital measure of profitability used by an insurance company to indicate how well it is performing.  A combined ratio below 100% indicates that a company is making an underwriting profit while a ratio above 100% means that it is paying out more money in claims that it is receiving from premiums.  Even if the combined ratio is above of 100%, a company can

potentially still make a profit, because the ratio does not include the income received from investments. The combined ratio is comprised of the claims ratio and the expense ratio. The claims ratio is claims owed as a percentage of revenue earned from premiums. The expense ratio is operating costs as a percentage of revenue earned from premiums. The combined ratio is calculated by taking the sum of incurred losses and expenses and then dividing them by earned premium.  Many insurance companies, rating agencies and analyst believe that the combined ratio is the best way to measure the success of a company because it does not include investment income and therefore only includes underwriting profit that is earned through efficient management.

88.    Defendants' reserve manipulation also permitted the Company to avoid violating the loan covenants in connection with the financing of the ProCentury acquisition.  Defendants knew that a material goodwill write-down (like the one later taken in August 2013, as discussed *infra*) would have serious consequences to a regulated entity like Meadowbrook, insofar as it could trigger a violation of Meadowbrook's loan covenants, which would further affect not only the Company's financial health but also its ability to conduct business in different jurisdictions. Thus, Defendants were motivated to manipulate the Company's reserves between 2008 and 2010, and thereafter throughout the Class Period, because that manipulation allowed certain business lines to appear to earn more, which was a way to continue to justify keeping the goodwill on the books without any recognition of impairment or loan covenant default.

### e.  The Top Ten Exposure Program

89.    In November 2011, Defendants claimed that the Company launched a new initiative, referred to as the "Top Ten Exposure" program, purportedly to re-evaluate internal processes related to setting reserves.  According to Defendants, the goal of the Top Ten

Exposure program was "to identify (but not necessarily change reserves on) high exposure claims earlier in the claims process."  *See* Meadowbrook Form 8-K, filed November 27, 2012, at 22.  As claims adjusters reported their "Top Ten Exposure" claims to management, and those claims were escalated to the corporate claims department, it revealed the stark deficiencies in reserves that had accumulated as a result of Defendants' fraudulent scheme to raid reserves in order to boost the Company's financial results.

90.     No sooner was the Top Ten Exposure Program announced than the Company reversed the trend of releasing reserves and reporting favorable results.  In January 2012, Defendants announced that the Company would take a pre-tax expense/loss reserve charge of $7.7 million for the fourth quarter of 2011.  The amounts reserved in an apparent effort to make up the shortfall increased throughout 2012:

| (in millions) | 4Q 2011 | 1Q 2012 | 2Q 2012 | 3Q 2012 |
|---|---|---|---|---|
| Net change in reserves | $7.7 | $10.21 | $28.22 | $42.9 |

91.     These loss reserve charges directly impacted net operating income, and the Company reported net operating losses of $11.64 million in the second quarter of 2012 and $49.65 million in the third quarter of 2012.

92.     Defendants faced mounting pressure from investors to explain why the Company's reserve processes kept missing the mark in escalating amounts.  Rather than acknowledge the non-existence of the Company's "balanced," "conservative," and "disciplined" business approach in the prior periods,  Defendants used the Top Ten Exposure Program as a convenient cover story, claiming that its "unintentional effect" was to "accelerate[] the development patterns of the claims towards ultimate probable cost," necessitating increases in

reserves.  Defendant Cubbin assured investors that this simply represented "a more conservative position" than the Company had maintained in the past.

93.    In reality, the seemingly-sudden increases in reserves represented Defendants' long overdue effort to return loss reserves to the same level the Company had maintained at the start of the Class Period.  As demonstrated by the chart below, following significant declines in the ratio of reserves to net earned premiums, the trend reversed in 2012, continuing through 2013, when the ratio of reserves to net earned premiums was restored to a level comparable to what the Company maintained in 2008:

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| TOTAL RESERVES | 625.3 | 682.4 | 784.2 | 879.1 | 1,074.1 | 1,111.1 |
| Net earned premiums | $369.7 | $539.6 | $659.8 | $747.6 | $854.3 | $697.4 |
| Reserves/Premiums | 1.69 | 1.26 | 1.18 | 1.17 | 1.26 | 1.59 |

94.    Thus, the Top Ten Exposure program was not responsible for the increases in reserves, but only served to bring to light what Defendants already knew, namely that the Company needed to restore balance by augmenting reserves that had been artificially depressed in prior periods.  Moreover, rather than embracing the information gleaned from this purportedly new initiative, Defendants found reasons to continue to under-reserve, while increasing reserves and shoring up surpluses just enough to shed A.M. Best's "under review with negative implications" status, only to face overwhelming claim losses yet again within a few months.

**Defendants Improperly Delayed Recognizing a Goodwill Impairment Charge**

95.    During the Class Period, Defendants represented that Meadowbrook's financial statements were prepared in conformity with GAAP.  These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed any recognition of a goodwill impairment charge for the Company's Specialty Insurance Operations, and which included ProCentury, thereby falsely inflating the Company's income and

assets during the Class Period, until Meadowbrook belatedly decided to write down 95% of its goodwill on August 14, 2013.

96.    Defendants' understanding of GAAP's mandate associated with goodwill is affirmed by the disclosure in the Company's 2008 Form 10-K, which stated, in pertinent part as follows:

> Goodwill represents the excess of the amounts we paid to acquire subsidiaries and other businesses over the fair value of their net assets at the date of acquisition. We test all existing goodwill at least annually for impairment, using a fair value approach on a reporting unit basis. The reporting unit is the operating segment or a business one level below that operating segment if discrete financial information is prepared and regularly reviewed by management at that level. Our annual assessment date for goodwill impairment testing is October 1st. However, pursuant to SFAS No. 142, "Goodwill and Other Intangible Assets," we are required to test for impairment more frequently if events or changes in circumstances indicate that the asset might be impaired. The fair value of the reporting unit is impacted by the performance of the business and could be adversely impacted by any efforts we make to limit risk. If it is determined that the goodwill has been impaired, we would be required to write down the goodwill by the amount of the impairment, with a corresponding charge to net income. Such impairments could have a material adverse effect on our results of operations or financial position.

97.    According to Meadowbrook's 2008 10-K, which was signed by defendants Cubbin, Spaun and the Company's directors for the year ended 2008, the Company was required to test, at least annually, all existing goodwill for impairment using a fair value approach, on a reporting unit basis.  According to the 2008 10-K, the Company's annual assessment date for goodwill impairment testing was October 1st of each calendar year.  Otherwise, goodwill impairment testing is also done when there is a specific triggering event at any point during the year.

98.    On November 10, 2008, the Company filed with the SEC its 10-Q report for the quarter ending September 30, 2008, which was signed by Defendants Spaun.  The Form 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial

information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.   In that report, the Company reported that its goodwill increased from $43.4 million (for the period ending December 31, 2007) to $108.6 million (for the period ending September 30, 2008).  The majority of the increase in goodwill ($59.5 million) was a result of the ProCentury merger.

99.   On March 16, 2009, the Company filed its 2008 10-K with the SEC.  As of December 31, 2008, goodwill attributable to "Specialty Insurance Operations" was $115.5 million -- made up of the following ($37.03 million  - balance at December 31, 2007; $3.02 million - transfer between reporting units; $16.04 million - additions to goodwill from the USSU acquisition; and $59.49 million - additions to goodwill from the ProCentury merger.)   The Company reported that it had determined there were no events that might have triggered goodwill impairment as of December 31, 2009.

100.   On March 15, 2010, Meadowbrook filed with the SEC its Form 10-K report for the year ended December 31, 2009 (the "2009 10-K"), which was signed by Defendants Cubbin and Spaun and the Company's directors and accompanied by SOX certifications signed by Defendants Cubbin and Spaun.   The Company reported that it had determined there were no triggering events that would indicate any potential goodwill impairment as of December 31, 2009.

101.   On March 16, 2011, Meadowbrook filed with the SEC its Form 10-K report for the year ended December 31, 2010 (the "2010 10-K"), which was signed by Defendants Cubbin and Spaun and the Company's directors and accompanied by SOX certifications signed by Defendants Cubbin and Spaun.   The Company reported that it had determined, yet again, that

there were no triggering events that would indicate any potential goodwill impairment as of December 31, 2010.

102.    The Company adopted amended guidance on testing goodwill for impairment during 2011, discussed at greater length below, selecting October 1st as the evaluation date. As part of the analysis, Defendants evaluated the impact of events and circumstances, including both positive and negative evidence that had occurred since the last annual goodwill impairment test date of October 1, 2010.  Based on this qualitative assessment, Defendants concluded that there was no goodwill impairment during 2011. Accordingly, no two-step impairment test was performed during 2011. In accordance with accounting guidance, the Company concluded its reporting units to be agency operations and specialty insurance operations. The nature of the business and economic characteristics of all agency operations and all specialty insurance operations are similar based upon, but not limited to, the following; (1) management alignment within each reporting unit, (2) the Company's Insurance Company Subsidiaries operate under a reinsurance pooling arrangement, and (3) the ability of the Company to leverage its expertise and fixed costs within each reporting unit.

103.    The Company's Q3 2011 Form 10-Q filed on November 9, 2011, which was signed by Defendant Spaun and accompanied by SOX certifications signed by Defendants Cubbin and Spaun, disclosed the new FASB guidance.

104.    On November 9, 2012, the Company filed a quarterly report for the period ended September 30, 2012 on a Form 10-Q with the SEC (the "Q3 2012 10-Q").  The Form 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Q3 2012 10-Q, the Company also

reported that as of September 30, 2012, the Company had $121.0 million of goodwill recorded and had performed an interim goodwill impairment test:

> As of September 30, 2012, the Company had $121.0 million of goodwill recorded. In accordance with accounting guidance, the Company concluded its reporting units to be agency operations and specialty insurance operations (SIO). As a result of operating results to date, the updated forecast of the fair value of the SIO reporting unit has decreased. As such, the Company performed an interim goodwill impairment test as of September 30, 2012, updating its cash flow projections and related assumptions from the analysis performed as of October 1, 2011. As a result of completing this analysis, the SIO's fair value exceeded its carrying value. Subsequent to September 30, 2012, we have identified certain additional indicators of potential goodwill impairment in the SIO reporting unit. These indicators include a notable decrease in the stock price of the Company as well as the A.M. Best review with negative implications.  In connection with our annual impairment test of goodwill as of October 1, 2012, we will consider these indicators in connection with the SIO's fair value.

105.    As set forth in more detail below, on August 14, 2013, after reporting five years of unchanged goodwill, the Company announced that it would take a non-cash impairment of goodwill of $115.4 million in the three months ended June 30, 2013. The impairment charge related to Meadowbrook's "Specialty Insurance Operations" and wiped out 95% of the Company's goodwill on its balance sheet, causing the Company to violate "financial covenants" applicable to the certain credit facilities.  Remaining goodwill as of June 30, 2013 was just $5.64 million relating to agency operations.

106.    In effect, this meant that Meadowbrook had suddenly determined that virtually all of Meadowbrook's business related to the Specialty Insurance Operations, which included ProCentury, was no longer able to generate enough future revenue and income to justify the $120.0 million of goodwill listed on Meadowbrook's balance sheet. This happened during a time when Defendants were touting the Company's intensified scrutiny of its risks and conservative method of establishing and maintaining reserves.  If the Company had not improperly used reserves to increase its income and if the appropriate reserve analysis had been undertaken,

goodwill would have been required to be written off at a much earlier date.   A goodwill impairment charge should have been taken no later than the Company's Q3 2012 expense/loss reserve charge of $31.4 million, which was announced on October 18, 2012, because Meadowbrook's earnings prospects going forward would not justify maintaining the goodwill at its current carrying value.   The effect of the reserve manipulation was to increase reported profits and thus to justify that the goodwill was not impaired. The reduction of reserves and the corresponding increase of profits was a deliberate scheme that improperly supported the goodwill analysis.   Had the manipulation not occurred the impairment test would have produced negative results which would have required the write off of goodwill to be taken much earlier. Moreover, had any impairment, however small, been properly recognized in the financial statements of the Company, before or during the Class Period, such impairment would have had the effect of at least mitigating the inflation in Meadowbrook's stock price and thus reducing or eliminating the losses suffered by Plaintiffs and the Class.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

### Defendants' False and Misleading Fourth Quarter 2008 and Year-End Statements

107.    The Class Period begins on February 17, 2009, when the Company's stock was trading on the NYSE at $5.52 per share.   On that day, Meadowbrook issued a press release (the "February 17, 2009 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun, reporting on the Company's fourth quarter 2008 and year-end 2008 results.  It reported that Q4 2008 net operating income was $12.3 million, or $0.21 per diluted share, compared to $7.3 million, or $0.20 per diluted share in 2007.   Net income for the quarter was $7.7 million, or $0.13 per diluted share compared to $7.3 million, or $0.20 per diluted share, in 2007.  For the full year ended December 31, 2008, the Company reported net operating

income of $38.8 million, or $0.86 per diluted share and net income for the year was $27.4

million, or $0.61 per diluted share.  Defendant Cubbin was quoted in the February 17, 2009 Press

Release as stating (with emphasis added):

> We are pleased with our net operating results for the fourth quarter, particularly
> our net operating income, excluding amortization of $13.9 million, or $0.24 per
> diluted share. ***The improvement in our combined ratio is due to our consistent
> underwriting discipline and favorable development on prior accident year loss
> reserves.*** Although we had an after-tax realized loss of $4.6 million on our
> investment portfolio during the fourth quarter, we continue to be conservatively
> positioned with a duration of 4.5 years and an average S&P rating of AA+ on our
> fixed income portfolio. For the fourth quarter, growth in gross written premium
> was 56.9%, which includes $42.4 million from ProCentury. We continue to work
> on opportunities to realize revenue enhancing synergies from the merger. We
> have been pleased with how well the post merger integration has developed.

108.     On March 16, 2009, Meadowbrook filed its 2008 10-K with the SEC, which was

signed by Defendants Cubbin and Spaun and the Company's directors and which was

accompanied by SOX certifications signed by Defendants Cubbin and Spaun.   In the 2008 10-K,

Defendants concluded that the Company maintained effective internal controls over financial

reporting and portrayed the Company as safe, conservative and efficient with regard to its

various business lines.  The Company also touted its disciplined reserve process, and explained,

"In developing claim and claim adjustment expense reserve estimates, we perform a complete

and detailed reserve analyses each quarter."

109.     The 2008 10-K also touted Meadowbrook's claims administration and handling

(with emphasis added):

> *Claims Administration and Handling*. Through our risk management subsidiary,
> we provide substantially all claims management and handling services for
> workers' compensation and most other lines, such as property, professional
> liability, and general liability. ***Our claims handling standards are set by our
> corporate claims department and are monitored through self-audits, corporate
> claim audits, internal controls, and other executive oversight reports.*** We handle
> substantially all claims functions for the majority of the programs we manage.
> Our involvement in claims administration and handling provides feedback to

program managers in assessing the client's risk environment and the overall structure of the program.

110.     In the 2008 10-K, for the year ended December 31, 2008, Meadowbrook reported a decrease in net ultimate loss estimates for accident years 2007 and prior of $16.8 million, which amount was therefore transformed from reserves into earnings and which thereby was 30% of the Company's pre-tax net operating income of $55.2 million.

111.     The statements referenced above in ¶¶107-110 were each materially false and misleading when made, because Defendants misrepresented and/or failed to disclose that, *inter alia*: (1) the Company was inadequately reserved based upon its rapid expansion and altered risk profile; (2) loss reserves were manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; and (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers.

**Defendants' False and Misleading First Quarter 2009 Statements**

112.     On May 4, 2009, the Company issued its financial results in a press release listing Defendant Spaun as a Company contact (the "May 4, 2009 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  On that day, Meadowbrook reported Q1 2009 net operating income of $16.3 million, or $0.28 per diluted share, compared to $7.1 million, or $0.19 per diluted share, in Q1 2008.  Net income for the Q1 2009 was $13.5 million, or $0.24 per diluted share compared to $7.1 million, or $0.19 per diluted share, for Q1 2008.  The Q1 2009 GAAP combined ratio was 87.7%, compared to 93.9% for Q1 2008. The loss ratio for Q1 2009 was 58.0%, compared to 61.7% for Q1 2008.

113.     In the May 4, 2009 Press Release, Defendant Cubbin explained that the Company had determined that its estimates for losses to be incurred from policies written in prior years had decreased.  Defendant Cubbin commented in the May 4, 2009 Press Release as follows (with emphasis added):

> We are pleased with our results for the first quarter, particularly our net operating income, (excluding amortization) of $17.8 million, or $0.31 per diluted share. Growth in gross written premium was 76.8%, which includes Century Insurance. We remain optimistic about our current revenue growth prospects and the development of additional revenue enhancing synergies from the merger. Overall, we have been selective about our growth and we are maintaining our focus on price adequacy. Our combined ratio improvement is due to our ***favorable development on prior accident year loss reserves, primarily in the general liability line, as well as a reduction in the residual market charges on our workers' compensation line of business***. While we had an after-tax realized loss of $2.8 million on our investment portfolio, we continue to be conservatively positioned and hold high quality investments. 2.0% of our portfolio is in equities, and our fixed income portfolio has an average S&P rating of AA+.

114.     On May 8, 2009, the Company filed its quarterly report for the first quarter ended March 31, 2009 on Form 10-Q with the SEC (the "Q1 2009 10-Q").  The Q1 2009 10-Q was signed by Defendant Spaun and contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The Company reported net earned premiums of $129.0 million, total revenues of $147.0 million, total expenses of $128.2 million and net income of $13.5 million or $0.24 per diluted share.  The Company disclosed the following regarding a decrease in net ultimate loss estimates: "For the three months ended March 31, 2009, we reported a decrease in net ultimate loss estimates for accident years 2008 and prior of $8.3 million, or 1.3% of $625.3 million of net loss and LAE reserves at December 31, 2008." This $8.3 million decrease in reserves (and correlating increase in earnings) was material and

represented approximately 35% of the Company's $23.3 million of net pre-tax operating income for the Q1 2009.

115.     The statements referenced above in ¶¶112-114 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) goodwill was materially overstated.

**Defendants' False and Misleading Second Quarter 2009 Statements**

116.     On August 3, 2009, Meadowbrook issued a press release reporting Q2 2009 results (the "August 3, 2009 Press Release") that listed Defendant Spaun as a Company Contact and that was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   The Company reported Q2 2009 net operating income of $11.9 million, or $0.21 per diluted share, compared to $8.5 million, or $0.23 per diluted share, in Q2 2008.  Net income for Q2 2009 was $11.6 million, or $0.20 per diluted share compared to $8.4 million, or $0.23 per diluted share, for Q2 2008.  Q2 2009 GAAP combined ratio was 92.7%, compared to 90.5% for the Q2 2008. The loss ratio for Q2 2009 was 59.4%, compared to 61.2% for Q2 2008.

117.     In the August 3, 2009 Press Release, Defendant Cubbin announced that the Company had determined for yet another consecutive quarter that its loss estimates for losses to be incurred from policies written in prior years had decreased.  However, Cubbin did not explain

that the Company was improperly using those released reserves to materially increase its second quarter and six months' 2009 net income.  Cubbin stated in the August 3, 2009 Press Release (with emphasis added):

> Throughout the first half of 2009 we have focused on price adequacy and selective growth with ***strict adherence to underwriting discipline***, and as a result, our performance in the second quarter and first half of the year has positioned us to achieve results at the high end of the range we previously set of $46 million to $52 million of net operating income. This generates operating EPS at the high end of the range of $0.80 to $0.90 per share. Growth in gross written premium was 66.3% for the quarter, and we continue to be optimistic about our prospects for revenue growth. ***We will continue to be selective in our approach to premium growth***, as our markets have remained competitive. In certain classes of business, rate decreases that we saw in the recent past are moderating, but in our opinion the market is stabilizing, not hardening. We are pleased with our combined ratio results for the second quarter, ***which includes favorable development on prior year accident year loss reserves in our workers' compensation, general liability and auto liability lines***. We expected that the revenue and income from our commission and fee-for-service business would decline in 2009 because a fee-based client decided to assume the administration of the program in-house. Also, management fees and commissions based on premium have declined because of the competitive market and poor economic conditions.

118.    On August 10, 2009, the Company filed its quarterly report for the period ended June 30, 2009 on a Form 10-Q with the SEC that was signed by Defendant Spaun (the "Q2 2009 10-Q").  The Q2 2009 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun falsely stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For the three months ended June 30, 2009, the Company reported net earned premiums of $127.1 million, total revenues of $146.9 million, total expenses of $131.5 million and net income of $11.6 million or $0.20 per diluted share.  The Company disclosed yet another decrease in net ultimate loss estimates "For the three months ended June 30, 2009, we reported a decrease in net ultimate loss estimates for accident years 2008 and prior of $6.3 million, or 1.0% of $625.3 million of net loss and LAE reserves at December 31, 2008."  This $6.3 million decrease in reserves (and

correlating increase in earnings) was material and represented approximately 38% of the Company $16.3 million of net pre-tax operating income for the 2Q 2009.

119.    The statements referenced above in ¶¶116-118 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading Third Quarter 2009 Statements**

120.    On November 9, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on a Form 10-Q with the SEC that was signed by Defendant Spaun (the "Q3 2009 10-Q").  The Q3 2009 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun claiming that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For the three months ended September 30, 2012, the Company reported net earned premiums of $137.3 million, total revenues of $160.1 million, total expenses of $145.0 million and net income of

46

$11.0 million or $0.19 per diluted share. The Company disclosed yet another decrease in net ultimate loss estimates: "For the three months ended September 30, 2009, we reported a decrease in net ultimate loss estimates for accident years 2008 and prior of $6.2 million, or 1.0% of $625.3 million of net loss and LAE reserves at December 31, 2008." This $6.2 million decrease in reserves (and correlating increase in earnings) was material and represented approximately 39% of the Company $15.8 million of net pre-tax operating income for the Q3 2009.

121.     As a result of the Company's manipulation of reserves as described above, by December 31, 2009, the Company's stock price was trading at $7.40 per share, up approximately 34% from the beginning of the Class Period.

122.     The statements referenced above in ¶120 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) goodwill was materially overstated.

**Defendants' False and Misleading Fourth Quarter 2009 and Year-End Statements**

123.     On February 16, 2010, Meadowbrook issued a press release, which listed Defendant Spaun as a Company contact, reporting on the Company's Q4 2009 and year-end 2009 results (the "February 16, 2010 Press Release"). For Q4 2009, the Company reported that

net operating income for the quarter was $13.6 million, or $0.24 per diluted share, compared to $12.3 million, or $0.21 per diluted share in Q4 2008.  Net income for Q4 2009 was $16.4 million, or $0.29 per diluted share compared to $7.7 million, or $0.13 per diluted share, for Q4 2008.  The Q4 2009 GAAP combined ratio was 94.3%, compared to 91.8% for Q4 2008.  The loss ratio for Q4 2009 was 60.6% compared to 59.5% for Q4 2008.  For the full year December 31, 2009, the Company reported net operating income of $53.5 million, or $0.93 per diluted share, compared to net operating income of $38.8 million, or $0.86 per diluted share in 2008.  Net income for the full year 2009 was $52.7 million, or $0.92 per diluted share, compared to net income of $27.4 million, or $0.61 per diluted share in 2008.   The GAAP combined ratio for the full year 2009 was 92.6%, compared to 93.3% in 2008.   The Company claimed that for yet another quarter, its estimates for losses to be incurred from policies written in prior years had decreased by $7.8 million.  This permitted Defendants to reduce reserves for claim losses and to use those released reserves to materially increase its net income.  This $7.8 million decrease in reserves (and correlating increase in earnings) was material and represented approximately 43% of the Company $17.7 million of net pre-tax operating income for the 4Q 2009.

124.     On March 15, 2010, Meadowbrook filed its 2009 10-K with the SEC, which was signed by Defendants Cubbin, Spaun and the Company's directors and which was accompanied by SOX certifications signed by Defendants Cubbin and Spaun.   In the 2009 10-K, Defendants claimed that the Company maintained effective internal controls over financial reporting and portrayed the Company as safe, conservative and efficient with regard to its various business lines.  The Company also touted its disciplined reserve process, and explained, "In developing claim and claim adjustment expense reserve estimates, we perform a complete and detailed reserve analyses each quarter."

125.     The 2009 10-K also touted Meadowbrook's claims administration and handling (with emphasis added)::

> _Claims Administration and Handling_. Through our risk management subsidiary, we provide substantially all claims management and handling services for workers' compensation and most other lines, such as property, professional liability, and general liability. ***Our claims handling standards are set by our corporate claims department and are monitored through self-audits, corporate claim audits, internal controls, and other executive oversight reports.*** We handle substantially all claims functions for the majority of the programs we manage. Our involvement in claims administration and handling provides feedback to program managers in assessing the client's risk environment and the overall structure of the program.

126.     For the year ended December 31, 2009, Meadowbrook reported a decrease in net ultimate loss estimates for accident years 2008 and prior of $28.7 million.  This $28.7 million decrease in loss reserves had the material effect of increasing 2009 pre-tax net operating income of $73.3 million by 39%.

127.     The statements referenced above in ¶¶123-126 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) goodwill was materially overstated.

**Defendants' False and Misleading First Quarter 2010 Statements**

128.     On May 3, 2010, Meadowbrook issued a press release, which listed Defendant Spaun as a Company contact, reporting its Q1 2010 results (the "May 3, 2010 Press Release"). The Company reported Q1 2010 net operating income of $16.8 million, or $0.30 per diluted share, compared to $16.3 million, or $0.28 per diluted share, in Q1 2009.  Net income for Q1 2010 was $16.4 million, or $0.30 per diluted share compared to $13.5 million, or $0.24 per diluted share, for Q1 2009.  The Q1 2010 GAAP combined ratio was 92.1%, compared to 88.2% for Q1 2009.  The loss and LAE ratio decreased 0.2 percentage points to 57.8% for the three months ended March 31, 2010, from 58.0% for the same period in 2009.

129.     In the May 3, 2010 Press Release, Defendant Cubbin touted the Company's growth and efficient claims handling:

> Based upon our first quarter results and the impact of our active share repurchase plan, we are increasing our full year guidance upward. We expect net operating income to be in a range of $50.0 million to $55.0 million, or $0.90 to $1.00 per share.  We expect gross written premium in a range of $790 million to $815 million, and we expect a combined ratio of 94.5% to 96.0%.

130.     Commenting on the 2010 outlook, Mr. Cubbin stated:

> We are pleased with our continued growth in earnings and the positive results of new business initiated in the second half of 2009, which have started to contribute to our bottom line. ***We are maintaining our focus on price adequacy, disciplined underwriting, efficient claims handling and geographic and product diversification, which is enhancing our ability to manage through this prolonged competitive market with profitable growth***.

131.     On May 10, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on a Form 10-Q with the SEC that was signed by Defendant Spaun (the "Q1 2010 10-Q").  The Q1 2010 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For Q1 2010, the

Company reported net earned premiums of $151.4 million, total revenues of $174.2 million, total expenses of $151.0 million and net income of $16.4 million or $0.30 per diluted share.  Once again, the Company determined to decrease its net ultimate loss estimates: "For the three months ended March 31, 2010, we reported a decrease in net ultimate loss estimates for accident years 2009 and prior of $9.7 million, or 1.4% of $682.4 million of beginning net loss and LAE reserves at December 31, 2009."  This $9.7 million decrease in loss reserves (and correlating increase in earnings) was material and represented approximately 41% of the Company $23.2 million of net Q1 2010 pre-tax operating income.

132.    The statements referenced above in ¶¶128-131 were each materially false and misleading when made, because Defendants failed to disclose and/or deliberately misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading Second Quarter 2010 Statements**

133.     On August 2, 2010, Meadowbrook issued a press release reporting its Q2 2010 results and listing Defendant Spaun as a Company contact (the "August 2, 2010 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   It reported Q2 2010 net operating income of $12.6 million, or $0.23 per diluted share, compared to $11.9 million, or $0.21 per diluted share, in Q2 2009.   Net income for Q2 2010 was $12.9 million, or $0.24 per diluted share compared to $11.6 million, or $0.20 per diluted share, for Q2 2009.  The GAAP combined ratio for Q2 2010 was 96.2%, compared to 93.3% for Q2 2009. The calendar year loss and LAE ratio for Q2 2010 increased 1.6 percentage points to 61.0%  from 59.4% for Q2 2009.

134.     In the August 2, 2010 Press Release, Defendant Cubbin stated:

> We are pleased with our second quarter results as we continue to achieve profitable growth in a competitive environment. Our growth strategy has been based upon meaningful long-term relationships in addition to geographic and product diversity. ***Current quarter growth is primarily the result of new initiatives that were launched in the second half of 2009. Our focus on pricing adequacy and disciplined underwriting has resulted in increased net operating income as compared to the prior year.*** While the 2010 accident year loss ratio is up slightly as compared to the prior year, the business we are writing is profitable and in line with our underwriting expectations.
>
> *              *              *
>
> We are pleased with our performance thus far in 2010. ***We are maintaining our focus on price adequacy, disciplined underwriting, efficient claims handling and geographic and product diversification, which is enhancing our ability to manage through this prolonged competitive market with profitable growth.*** We continue to believe that the higher end of the range of our net operating income is achievable.

135.     On August 9, 2010, the Company filed with the SEC its quarterly report for the period ended June 30, 2010 on a Form 10-Q that was signed by Defendant Spaun (the "Q2 2010 10-Q"), which contained signed SOX certifications by Defendants Cubbin and Spaun stating that

the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For Q2 2009, the Company reported net earned premiums of $162.7 million, total revenues of $183.6 million, total expenses of $166.7 million and net income of $12.8 million or $0.24 per diluted share.  The Company disclosed yet another decrease in net ultimate loss estimates: "For the three months ended June 30, 2010, we reported an additional decrease in net ultimate loss estimates for accident years 2009 and prior of $6.8 million, or 1.0% of $682.4 million of net loss and LAE reserves at December 31, 2009."   This $6.8 million decrease in reserves (and correlating increase in earnings) was material and represented approximately 40% of the Company $16.6 million of net pre-tax operating income for the 2Q 2010.

136.     The statements referenced above in ¶¶133-135 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium

growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading Third Quarter 2010 Statements**

137.     On November 1, 2010, Meadowbrook issued a press release reporting its Q3 2010 results that listed Defendant Spaun as a Company contact (the "November 1, 2010 Press Release") and that was filed with the SEC as an attachment to a Form 8-K signed by Defendant Spaun.   The November 1, 2010 Press Release falsely reported Q3 2010 net operating income of $14.6 million, or $0.27 per diluted share, compared to $11.7 million, or $0.20 per diluted share, in the prior year third quarter.   Net income for Q3 2009 was $15.0 million, or $0.28 per diluted share compared to $11.0 million, or $0.19 per diluted share, Q3 2009.   Q3 2010 GAAP combined ratio was 95.9%, which was consistent with Q3 2009. The calendar year loss and LAE ratio for Q3 2010 decreased 2.9 percentage points to 61.6% from 64.5% for Q3 2009.

138.     In the November 1, 2010 Press Release, Defendant Cubbin claimed that the Company's increase in net operating income was a result of a focus on "pricing adequacy" and "disciplined underwriting," stating:

> We are pleased with our third quarter results as we continue to achieve profitable growth in a competitive market. Our growth strategy has been to establish geographic and product diversity through building meaningful long-term relationships. ***Current quarter growth is primarily the result of new initiatives that were launched in the second half of 2009. Our focus on pricing adequacy and disciplined underwriting has resulted in a significant increase to net operating income as compared to the prior year***. (Emphasis added.)

139.     On November 9, 2010, the Company filed with the SEC a quarterly report for the period ended September 30, 2010 on a Form 10-Q that was signed by Defendant Spaun (the "Q3 2010 10-Q").   The Q3 2010 10-Q contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.   For

Q3 2010, the Company reported net earned premiums of $171.8 million, total revenues of $195.7 million, total expenses of $175.6 million and net income of $15.0 million or $0.28 per diluted share. The Company disclosed yet another decrease in net ultimate loss estimates: "For the three months ended September 30, 2010, we reported an additional decrease in net ultimate loss estimates for accident years 2009 and prior of $7.3 million, or 1.1% of $682.4 million of net loss and LAE reserves at December 31, 2009." This $7.3 million decrease in loss reserves (and correlating increase in earnings) was material and represented approximately 36% of the Company $19.8 million of net pre-tax operating income for the 3Q 2010.

140. The statements referenced above in ¶¶137-139 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading Fourth Quarter 2010 and Year-End Statements**

141.    On February 15, 2011, Meadowbrook issued a press release, listing Defendant Spaun as a Company contact, reporting on the Company's fourth quarter 2010 and year-end 2010 results (the "February 15, 2011 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   For Q4 2010, the Company reported that net operating income for the quarter was $14.2 million, or $0.26 per diluted share, compared to $13.6 million, or $0.24 per diluted share in 2009.   Net income for the quarter was $15.4 million, compared to $16.4 million, in 2009.  For the full year ended December 31, 2010, the Company reported net operating income of $58.2 million, or $1.07 per diluted share and net income for the year was $59.7 million, or $1.10 per diluted share.  The combined ratio was 95.0%, compared to 93.2% for the year ended December 31, 2009.

142.    Commenting on the results, Defendant Cubbin stated in the February 15, 2011 Press Release (with emphasis added):

> We are pleased with our results as we continue to achieve profitable growth in a competitive market. Our growth strategy has been to develop specialty niche expertise in a range of select areas. Through this approach we have developed a book of business that is broadly diversified by line of business, customer base and geography. We believe this diversity reduces our risk profile and enables us to generally deliver more predictable results. ***Our focus on pricing adequacy and disciplined underwriting has resulted in a significant increase to net operating income as compared to the prior year.***

143.    In the February 15, 2011 Press Release, the Company also provided guidance for 2011:

> For 2011, we expect net operating income to be in a range of $53.0 million to $58.5 million. We expect gross written premium in a range of $830 million to $850 million, and the combined ratio should be in a range of 96.0% to 97.0%. Achieving results within these ranges would result in net operating income in a range of $1.00 to $1.10 per share. Commenting on the 2011 outlook, Mr. Cubbin stated: "We believe that 2011 should prove to be another good year for the Company. ***We will continue to focus on price adequacy, disciplined underwriting, efficient claims handling and developing specialty niche***

*expertise.* This strategy has served us well despite a prolonged period of low interest rates, as well as a competitive pricing environment, which we expect will continue into 2011.

144.     During this quarter, the Company's losses to be incurred from policies written in prior years decreased by approximately $7.2 million.  Once again, this permitted the Company to reduce reserves for claim losses and use those released reserves to materially increase its net income.  This $7.2 million decrease in loss reserves was material and represented approximately 37.5% of the Company $19.2 million of net pre-tax operating income for the 4Q 2010.

145.     On March 16, 2011, Meadowbrook filed with the SEC its 2010 10-K, which was signed by Defendants Cubbin, Spaun and the Company's directors and which was accompanied by signed SOX certifications by Defendants Cubbin and Spaun.   In the 2010 10-K, Defendants concluded that the Company maintained effective internal controls over financial reporting and portrayed the Company as safe, conservative and efficient with regard to its various business lines.  The Company also touted its disciplined reserve process, and explained, "In developing claim and claim adjustment expense reserve estimates, we perform a complete and detailed reserve analyses each quarter."

146.     The 2010 10-K also touted Meadowbrook's claims administration and handling:

> *Claims Administration and Handling*.  We provide substantially all claims management and handling services for workers' compensation and most other lines, such as property, professional liability, and general liability. ***Our claims handling standards are set by our corporate claims department and are monitored through self-audits, corporate claim audits, internal controls, and other executive oversight reports.*** We handle substantially all claims functions for the majority of the programs we manage. Our involvement in claims administration and handling provides feedback to program managers in assessing the client's risk environment and the overall structure of the program.

147.     For the year ended December 31, 2010, Meadowbrook reported a decrease in net ultimate loss estimates for accident years 2009 and prior of $31.0 million. This had the material effect of increasing pre-tax net operating income of $79 million by 39%.

148.     The statements referenced above in ¶¶141-147 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading First Quarter 2011 Statements**

149.     On May 2, 2011, Meadowbrook issued a press release reporting its Q1 2011 results that listed Defendant Spaun as a Company contact (the "May 2, 2011 Press Release") and that was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   The Company reported Q1 2011 net operating income of $14.5 million, or $0.27 per diluted share, compared to $16.8 million, or $0.30 per diluted share, in Q1 2010.  Net income for Q1 2011 was $15.1 million, or $0.28 per diluted share compared to $16.4 million, or $0.30 per diluted share,

for Q1 2010.  The GAAP combined ratio for the current quarter was 95.4%, compared to 92.1% in Q1 2010. As part of the press release, the Company affirmed 2011 guidance.

150.     Commenting on the 2011 outlook in the May 2, 2011 Press Release, Defendant Cubbin stated (with emphasis added):

> We are pleased with our first quarter results as the Company delivered good results in a highly competitive market. During the quarter, we achieved top line growth and improved our accident year combined ratio. ***These achievements underscore our commitment to pricing adequacy and adherence to disciplined underwriting standards.*** Looking ahead, we believe our balanced business model positions us well to continue to generate predictable earnings across the market cycle.

151.     On May 10, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on a Form 10-Q with the SEC and signed by Defendant Spaun (the "Q1 2010 10-Q").  It contained signed SOX certifications Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For the three months ended March 31, 2010, the Company reported net earned premiums of $170.6 million, total revenues of $193.4 million, total expenses of $173.7 million and net income of $15.1 million or $0.28 per diluted share.  The Company disclosed the following regarding yet another decrease in net ultimate loss estimates "For the three months ended March 31, 2011, we reported a decrease in net ultimate loss estimates for accident years 2010 and prior of $3.2 million, or 0.4% of $784.2 million of beginning net loss and LAE reserves at December 31, 2010."  This $3.2 million decrease in reserves (and correlating increase in earnings) was material and represented approximately 17% of the Company $18.9 million of net pre-tax operating income for the Q1 2011.

152.     The statements referenced above in ¶¶149-151 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) irrespective of purported "favorable developments," the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) the Company's perceived profitability was driven by manipulation of reserves and surplus, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Meadowbrook's Reserve Scheme Begins to Unravel**

153.     By the end of 2011 and throughout 2012, Meadowbrook's fraudulent scheme to boost earnings by manipulating reserves and surplus began to unravel, threatening the Company's carefully-engineered image as a dynamic, growing insurance enterprise.  As the risk of increased liabilities resulting from rampant premium growth began to materialize, Defendants were forced to begin increasing reserves (for all of its business lines) in each quarter.

154.     Yet, during this time period, undisclosed to investors, Meadowbrook's loss reserves _**still**_ were being set at materially inadequate levels at all of the Company's operating segments.  Despite suffering from significant internal control deficiencies relating to the setting of loss reserves, the Defendants, at the same time, as set forth below, continued to falsely state

that the Company had a "culture of disciplined underwriting, claims handling & reserving;" performed "a complete and detailed reserve analyses each quarter;" monitored its business results on a "granular level;" maintained a "balanced business model;" was "strengthen[ing] loss reserves;" had "stabilized" its reserve problems.

155.     Contrary to Defendants' public representations, the Company's reserve process and its internal control procedures were severely flawed.  The dramatic reserve increases during the latter part of the Class Period, followed by the August 13, 2013 announcement that almost all of the goodwill on Meadowbrook's books had been destroyed, revealed to the market that it had been misled and triggered the losses that were the consequence of having paid fraudulently inflated prices for Meadowbrook stock.

**Defendants' False and Misleading Second and Third Quarter 2011 Statements**

156.     On August 9, 2011, the Company filed with the SEC its quarterly report for the period ended June 30, 2011 on a Form 10-Q that was signed by Defendant Spaun (the "Q2 2011 10-Q").  It contained signed SOX certifications by Defendants Cubbin and Spaun falsely stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For the three months ended June 30, 2011, the Company reported net earned premiums of $181.4 million, total revenues of $204.2 million, total expenses of $192.0 million and net income of $9.9 million or $0.19 per diluted share.  The Company disclosed the following regarding an increase in net ultimate loss estimates: "For the three months ended June 30, 2011, we reported an increase in net ultimate loss estimates for accident years 2010 and prior of $0.9 million, or 0.1% of $784.2 million of net loss and LAE reserves at December 31, 2010."

157.     On October 31, 2011, Meadowbrook issued a press release reporting its third quarter 2011 results that listed Defendant Spaun as a Company contact (the "October 31, 2011 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   The Company reported Q3 2011 net operating income of $9.5 million, or $0.18 per diluted share, compared to $14.6 million, or $0.27 per diluted share, in Q3 2010.  Net income for Q3 2011 was $9.8 million, or $0.19 per diluted share compared to $15.0 million, or $0.28 per diluted share, for Q3 2010.   The Company announced that Q3 2011 results also included a change in after-tax development on prior year loss reserves of $1.3 million, or $0.02 per diluted share, as compared to Q3 2010 results, which include after-tax favorable development of $4.7 million, or $0.09 per diluted share. This was the second consecutive quarter that the Company announced an adverse loss reserve development.

158.     Despite the $1.3 million to pre-tax expense/loss reserve charge, Cubbin stated in the October 31, 2011 Press Release (with emphasis added):

> We believe that 2012 will be a strong year for the Company. *We will continue to focus on price adequacy, disciplined underwriting, efficient claims handling and geographic and product diversification.* This strategy has served us well despite a prolonged period of low interest rates, as well as a competitive pricing environment, which we expect will continue into 2012.

159.     The statements referenced above in ¶¶156-158 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts:  (1) despite slight increases in reserves, the Company was inadequately reserved based upon its rapid expansion and altered risk profile, as evidenced by, among other things, the decline in reserves relative to premiums and other financial analysis explained herein; (2) loss reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of

inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated..

**Defendants' False and Misleading Fourth Quarter 2011 and Year-End Statements**

160.     The truth was partially revealed on January 25, 2012, when the Company issued a press release (the "January 25, 2012 Press Release") filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun, which announced that the Company would need to take a third consecutive quarterly loss reserve charge in Q4 2011.   As a result of worse-than anticipated loss reserve development for earlier accident years, the Company reported that it expected to record a pre-tax expense/loss reserve charge of $7.7 million in Q4 2011.  In an effort to put a spin on the preannounced expense charge, the Defendants explained that this adjustment was to "strengthen loss reserves."   The Company further reported that it expected to report positive Q4 2011 net operating income and full year 2011 net operating income of $0.77 per diluted share to $0.79 per diluted share.

161.     In the January 25, 2012 Press Release, Defendant Cubbin deflected attention from the expense charge and emphasized positive performance from the Company's California workers' compensation business line (with emphasis added):

> Consistent with our culture of responding quickly to adverse experience, quarter *we strengthened our reserves in select lines of business during the fourth*. Over the past twenty-four months we have taken significant rate and underwriting action and we will continue to seek additional rate and underwriting actions for lines of business that are not meeting our profitability targets. Overall we have

been pleased with the rate increases achieved for the 2010 and 2011 policy years. ***We are also pleased with the performance of our California workers' compensation book of business as all indications are that rate increases are keeping up with the underlying loss trends and overall the business remains profitable***.

The loss reserve strengthening reflects higher than expected losses on isolated prior accident years in automobile liability, excess lines and workers compensation. This was partially offset by continued favorable development in other lines, particularly medical professional liability and general liability, although at lower levels of redundancy than in the recent past quarters.

162.     The January 25, 2012 Press Release also reassured investors that despite the $7.7 million expense allocated to "strengthen loss reserves," Meadowbrook would be well-positioned to deliver increased earnings in 2012.  Specifically, Defendant Cubin commented on the 2012 outlook and stated (with emphasis added):

While we are disappointed in the loss results for 2011, we are confident we can deliver better earnings in 2012. ***We have been actively monitoring our business by line, by state, and by class of business and have responded to a challenging market with appropriate underwriting and rating actions to help us return to a more acceptable level of underwriting profit.*** We remain optimistic about our future prospects and believe our balanced business model positions us well to deliver good results despite the low interest rate environment and competitive pricing conditions.

163.     On this news, the Company's stock price dropped $1.58 per share on January 26, 2012 to close at $10.02 per share, a one-day decline of nearly 14%.

164.     On February 14, 2012, Meadowbrook issued a press release listing Defendant Spaun as a Company Contact and reporting on the Company's fourth quarter 2011 and year-end 2011 results (the "February 14, 2012 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  For Q4 2011, the Company reported that net operating income for the quarter was $8.4 million, or $0.16 per diluted share, compared to $14.2 million, or $0.26 per diluted share in Q4 2010.   Net income for Q4 2011 was $8.8 million, or $0.16 per diluted share compared to $14.2 million, or $0.26 per diluted share, in Q4 2010.  For

the full year 2011, the Company reported net operating income of $40.9 million, or $0.78 per diluted share, compared to $58.2 million, or $1.07 per diluted share in 2010. Net income for the year was $43.6 million, or $0.83 per diluted share, compared to $59.7 million, or $1.10 per diluted share in 2010.

165.     Consistent with its January 25, 2012 preannouncement, the Company also reported in the February 14, 2012 Press Release that the 2011 pre-tax results included a $7.3 million increase in the estimate for prior year ultimate losses and loss adjustment expense reserves. The Company explained that this change in estimate reflected higher than expected losses on isolated prior accident years in automobile liability, excess lines and workers compensation. Commenting on the 2011 loss reserve expense, Defendant Cubbin stated in the February 14, 2012 Press Release (with emphasis added):

> Consistent with our culture of responding quickly to adverse experience, we increased our reserves in select lines of business during the year. Over the past twenty-four months we have taken significant rate and underwriting action and we will continue to seek additional rate and underwriting actions for lines of business that are not meeting our profitability targets. We remain pleased with the performance of our California workers' compensation book of business as indications are that rate increases are keeping up with the underlying loss trends and overall the business remains profitable.

> \*\*\*

> During 2011 we faced a range of challenges including an unusually high frequency of storms during the second quarter, sustained soft market pricing conditions, and a prolonged low interest rate environment. Despite these challenges, we delivered profitable underwriting results, increased our book value per share by 12.8% and enhanced our future growth potential by continuing to develop and build out our specialty insurance underwriting capabilities. ***We will continue to monitor our business results on a granular level, taking any indicated pricing and underwriting actions for lines of business that are not meeting our profitability targets***.

166.     On February 15, 2012, the Company held its Q4 2011 Earnings Conference Call. As part of that conference call, Defendants Spaun and Cubbin presented the Company's year-end

2011 financial results.  During the call, Randy Binner an analyst from FBR, asked Defendant Cubbin whether the Company anticipated any additional reserve charges and Cubbin responded that the Company at that point had adequate loss reserves:

> Q.    Do you foresee any additional charges or how are reserves developing?
>
> A.    Cubbin: No.  We're comfortable with where we've set the ultimate reserves.  Our actuarial team does a great deal of work and put a lot of effort into analyzing the results at year-end.  So, we're comfortable that they posted the reserves that they felt they needed to post.

167.    On February 17, 2012, the Company gave an investor presentation entitled "Year End Update – 2011," which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  In that presentation, the Defendants falsely touted Meadowbrook's purported "culture of disciplined underwriting, claims handling & reserving," "balanced business model" that allows it to "adapt to changing market conditions and deliver more predictable results," and "high quality investment portfolio [that] is well matched to our loss reserves and generates a predictable stream of income."

168.    On March 15, 2012, Meadowbrook filed with the SEC its Form 10-K report for the year ended December 31, 2011 (the "2011 10-K"), which was signed by Defendants Cubbin, Spaun and the Company's directors and which was accompanied by SOX certifications signed by Defendants Cubbin and Spaun.    In the 2011 10-K, Defendants falsely concluded that the Company maintained effective internal controls over financial reporting and portrayed itself as safe, conservative and efficient with regard to its various business lines.  The Company also touted its disciplined reserve process.  For example, it falsely represented that it had a culture of disciplined claims handling and reserving:

> Culture of Disciplined Underwriting, Claims Handling & Reserving:
>
> Our associates have significant experience across all functions of our business including underwriting, claims handling, and reserving.

*       *       *

We have also built a robust control environment where underwriting trends are closely monitored on a very granular level, which enables us to proactively manage our business and deliver consistent, profitable results. Finally, we have built a strong claims handling function internally and play a substantial role in claims management and handling activities.

169.    The 2011 10-K also falsely touted Meadowbrook's claims administration and handling:

> *Claims Administration and Handling.* We provide substantially all claims management and handling services for workers' compensation and most other lines, such as property, auto liability, professional liability, and general liability. Our claims handling is managed by our field offices. Corporate claims monitors the results through self-audits, corporate claim audits, internal controls, and other executive oversight reports. With the exception of MFH, whom we have direct access to their paid and case reserve loss data and perform corporate claims audits, we handle substantially all claims functions for the majority of the programs we manage. Our involvement in claims administration and handling provides benchmarks and valuable feedback to program managers in assessing the client's risk environment and the overall structure of the program.

170.    With regard to its most important business line - Workers Compensation, 2011 10-K emphasized that it performed a "complete and detailed reserve analyses each quarter" (with emphasis added):

> *In developing claim and claim adjustment expense reserve estimates, we perform a complete and detailed reserve analyses each quarter*. To perform this analysis, the data is organized at a "reserve category" level.  A reserve category can be a line of business such as commercial automobile liability, or it may be a particular geographical area within a line of business such as California workers' compensation. The reserves within a reserve category level are characterized as either short tail or long tail. About 97% of our reserves can be characterized as coming from long tail lines of business. For long tail business, several years may lapse between the time the business is written and the time when all claims are settled. Our long-tail exposures include workers' compensation, commercial automobile liability, general liability, professional liability, products liability, aviation liability, excess, and umbrella. Short-tail exposures include property, commercial automobile physical damage, a portion of ocean marine, and inland marine. The analyses generally review losses both gross and net of reinsurance.

171.    In the 2011 10-K, Meadowbrook also disclosed that it adopted ASU 2011-8, which amended guidance on testing for goodwill for impairment.  The amended guidance introduced an optional qualitative assessment for testing goodwill for impairment that allowed companies to skip the annual two-step test conducted to that point in time.  Under the new guidance, the Company was still required (a) to test goodwill for impairment annually, and more frequently if indicators of impairment exist and (b) to compare the fair value of a reporting unit to its carrying amount.  However, Defendants were newly enabled to first qualitatively assess whether it is more likely than not (defined as having a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount. If that is the case, the Company would have to perform the annual two-step impairment test described in ASU 2011-8 (as codified in FASB ASC 350), Intangibles-Goodwill and Other.  The guidance became effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011, with early adoption permitted.

172.    The Company adopted the amended guidance on testing goodwill for impairment during 2011, selecting October 1st as the evaluation date. As part of the analysis, Defendants evaluated the impact of events and circumstances, including both positive and negative evidence that had occurred since the last annual goodwill impairment test dated October 1, 2010.  Based on this qualitative assessment, Defendants concluded that there was no goodwill impairment during 2011. Accordingly, no two-step impairment test was performed during 2011.  For the year ended December 31, 2011, the Company reported $120.0 million of goodwill.

173.    The statements referenced above in ¶¶160-162 and 164-172 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts:    (1) despite the increases in reserves, the Company was

inadequately reserved based upon its rapid expansion and altered risk profile; (2) loss reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**Defendants' False and Misleading First Quarter 2012 Statements**

174.     On April 19, 2012, the Company issued a press release listing Defendant Spaun as a Company contact (the "April 19, 2012 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun, announcing that it would need to take yet another loss reserve charge.    This was the fourth consecutive quarter that the Company announced an adverse reserve development.  As a result of worse-than-anticipated loss reserve development for 2011 and earlier accident years, the Company reported that it expected to record a pre-tax expense/loss reserve charge of $10.2 million in the first quarter of 2012.  Of the $10.2 million charge, $3.1 million came from the Company's Workers Compensation business line, $2.3 million from Commercial Multi-Peril and $4.0 million from Commercial Auto, with the balance coming from other lines.  The April 19, 2012 Press Release indicated that the reserve charge would be spread out relatively evenly among the 2009, 2010 and 2011 accident years.

175.     Despite the announcement of the additional charge, Defendant Cubbin affirmed the Company's 2012 guidance in the April 19, 2012 Press Release:

> Despite the increase in these ultimate loss projections from older years, our current accident year loss ratios show positive signs of the cumulative pricing increases and underwriting actions we have taken over the last three years to stay ahead of industry loss cost trends. We therefore expect full year 2012 results to still come in at/or near the low end of the previously announced guidance range of $0.90 to $1.00.

176.    On April 20, 2012, the Company held a conference call to discuss the impact of the increase in net loss estimates for Q1 2012 and corresponding expense charge.  During the conference call, Defendant Cubbin attempted to falsely explain the reasons behind the $10.2 million in reserve charges.  In response to a question from an analyst regarding potential procedural changes to the Company's reserve process, Defendant Cubbin stated:

> I don't believe that any of these were the result of poor practices … We have lots of procedures in place to monitor changes in reserves.  We have a large litigation group that specializes in overseeing those kinds of things.  I wouldn't point the finger at anybody, other than sometimes you just get worse result than you were anticipating, and it doesn't necessarily mean that anybody missed something or misinterpreted it.  Sometimes it just goes the wrong way.

177.    On April 30, 2012, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting its Q1 2012 results (the "April 30, 2012 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   The Company reported Q1 2012 net operating income of $7.5 million, or $0.15 per diluted share, compared to $14.0 million, or $0.26 per diluted share, in Q1 2011.  Net income for the first quarter of 2012 was $8.1 million, or $0.16 per diluted share compared to $14.6 million, or $0.27 per diluted share, for Q1 2011.   Consistent with its April 19th preannouncement, the Company's results included the $10.2 million additional reserve charge (*i.e.*, the increase in net ultimate loss estimates for accident years 2011 and prior).  In the April 30, 2012 press release, Meadowbrook explained (with emphasis added) that of the $10.2 million charge, $3.1 million came from the Company's Workers Compensation business line and that the reserve process was now "stabilized":

<u>Workers Compensation</u>

The net ultimate loss estimates for accident years 2011 and prior in the workers'
compensation line of business increased $3.1 million, or 0.9%. As our business
grew in 2009-2011, claim counts increased. Additionally, as the case reserves
matured, our estimates for the ultimate probable cost on those newer claims
increased. During the first quarter of 2012, we also experienced an acceleration of
our claims closure rate ***which should be an indication that this phenomenon has
stabilized***. The increase in net ultimate loss estimates is spread approximately
equally over the 2009, 2010 and 2011 accident years.

In addition, Defendant Cubbin once again reaffirmed the Company's 2012 guidance:

Despite the increase in these ultimate loss projections from older years, our
current accident year loss ratios show positive signs of the cumulative pricing
increases and underwriting actions we have taken over the last three years to stay
ahead of industry loss cost trends. We therefore expect full year 2012 results to
still come in at/or near the low end of the previously announced guidance range of
$0.90 to $1.00.

178.     On May 10, 2012, the Company filed with the SEC its quarterly report for the

period ended March 31, 2012 on a Form 10-Q signed by Defendant Spaun (the "Q1 2012 10-

Q"), which contained signed SOX certifications by Defendants Cubbin and Spaun stating that the

financial information contained therein was accurate and disclosed any material changes to the

Company's internal control over financial reporting. The Company reported net earned

premiums of $192.8 million, total revenues of $216.2 million, total expenses of $206.9 million

and net income of $8.1 million or $0.16 per diluted share. The Company further reported total

assets of $2.46 billion including goodwill of $120.7 million. The Company disclosed the

following regarding an increase in net ultimate loss estimates: "For the three months ended

March 31, 2012, we reported an increase in net ultimate loss estimates for accident years 2011

and prior of $10.2 million, or 1.2% of $879.1 million of beginning net loss and LAE reserves at

December 31, 2011."   The Company also repeated statements made in the April 30th press

release.   Specifically, the Q1 2012 10-Q falsely stated that reserve issues within the Workers

Compensation business line were now "stabilized."

179.     The statements referenced above in ¶¶174-178 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) despite increases in reserves, the Company's financial condition continued to deteriorate, and the Company still was inadequately reserved based upon its rapid expansion and altered risk profile; (2) loss reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (3) the Company lacked adequate internal controls to detect and correct loss reserve deficiencies; (4) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (5) the Company did not adhere to disciplined underwriting standards; (6) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (7) goodwill was materially overstated.

**<u>Defendants' False and Misleading Second Quarter 2012 Statements</u>**

180.     On July 19, 2012, Meadowbrook issued a press release, listing Defendant Spaun as a Company contact, which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun, announcing that it would need to take yet another reserve charge (the "July 19, 2012 Press Release").   This was the fifth consecutive quarter that the Company announced an adverse reserve development.   Purportedly as a result of an increase in net ultimate loss estimates for 2011 and prior accident years, the Company reported that it expected to record a much larger pre-tax expense/loss reserve charge of $28.2 million in 2012.   The Company stated that the expense charge primarily reflected "incurred large loss activity that is higher than historic patterns."   As a result of the reserve charges, Meadowbrook revised its 2012 guidance:

Based on the first six months of 2012, management now expects net operating income to be in a range of $27 million to $30 million, a GAAP combined ratio of 101.5% to 102.5% and gross written premium in a range of $970 million to $990 million. Achieving results within these ranges would result in net operating income between $0.55 and $0.60 per diluted share.

181.    Commenting on the outlook for 2012, Mr. Cubbin stated in the July 19, 2012 Press Release:

In response to higher than expected incurred losses, we have been aggressively raising rates wherever appropriate and shrinking our business in states and classes of business where we perceive a reduced opportunity to generate an underwriting profit. Beginning in 2009, we have achieved cumulative rate increases of 7.9% across our total book of business, with the pace of rate increases accelerating in recent months. We believe the firming rate environment, in combination with our profitable current accident year results, positions us well for future profitability.

182.    In the July 19, 2012 Press Release, the Company summarized the additional reserve charges it would need to take in Q2 2012.   Of the $28.2 million charge, $7.8 million came from the Company's Workers Compensation business line, $14.2 million from Commercial Multi-Peril/General Liability (most of which related to Meadowbrook's Public Entity Excess Liability business) and $5.0 million from Commercial Auto, with the balance coming from other lines.   Defendant Cubbin made the following comments in the July 19, 2012 Press Release with respect to each of the business lines and respective reserve charges:

Workers' Compensation

With respect to workers' compensation, our largest line of business, *we continue to see favorable overall underwriting results*. In California, where we have achieved a cumulative filed rate increase of 41.4% starting in 2009, *our workers' compensation business remains profitable*. These rate increases have exceeded loss cost trends. However, we have slightly increased loss estimates for prior accident years. Through the first six months of 2012, we have experienced an acceleration of our claims closure rate and observed that while case reserves have increased, paid loss severities are stable and claim frequencies have decreased due to achieved rate increases. We view the paid loss severity and frequency trends, along with the rate increases that we have achieved as positive indicators for this business. In other areas of the country underwriting actions and rate increases have been effective and ultimate loss estimates have actually decreased.

73

Commercial Multi-Peril/General Liability

The net ultimate loss estimates for accident years 2011 and prior in the commercial multi-peril/general liability line of business increased $14.2 million, or 3.9%. Approximately $7.3 million of the increase reflects higher than expected large loss case reserve movement in our Public Entity excess liability program.

With respect to the Public Entity excess program, Mr. Cubbin stated:

As a result of our ongoing and proactive oversight of the primary claim management process within the underlying self-insured layer, particularly on high exposure cases, we believe our reserving to the ultimate probable costs per file has accelerated at a pace that is unprecedented in this program. … ***During the quarter, our claim managers continued to perform an exposure analysis on our larger exposure claims. This recent initiative was designed to identify earlier and focus our investigation and defense strategy on claims with higher exposures. This may have led to a higher level of incurred losses than indicated by our historical development patterns.***

Commercial Automobile

We believe the underwriting and rate actions are continuing to take hold as loss frequency in the 2012 accident year is down. Cumulative rate increases in the transportation program mentioned above have been approximately 46% since 2010 and exposure base is down more than 50%. As these rate increases continue to earn out in 2012, we expect improved current accident year results for this business.

Other Lines

Over the years we have demonstrated an ability to remediate programs that are not meeting our targets through a combination of underwriting and pricing actions. Although we have experienced increases in net ultimate loss estimates noted above, we have made significant headway in remediating where necessary. We will continue to earn premium in 2012 that reflects the cumulative rate increases and underwriting actions, which we expect to result in an improved combined ratio.

183.    On July 30, 2012, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting its Q2 2012 results (the "July 30, 2012 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   The Company reported a Q2 2012 net operating loss of ($8.8 million), or ($0.17) per diluted share, compared to

net operating income of $8.4 million, or $0.16 per diluted share, in Q2 2011.  Net loss for Q2

2012 was ($7.7 million), or ($0.15) per diluted share, as compared to net income of $9.8 million,

or $0.18 per diluted share, for Q2 2011. The results included the previously announced $28.2

million additional reserve charge (*i.e.*, the increase in net ultimate loss estimates for accident

years 2011 and prior).  The July 30, 2012 Press Release referenced the July 19, 2012 Press

Release for additional discussion on Meadowbrook's 2012 loss activity.  Commenting on the

quarter, Defendant Cubbin stated in the July 30, 2012 Press Release:

> We are disappointed to report an increase in net ultimate losses on prior accident
> years and will continue to take actions to improve the profitability of our business
> as we strive to deliver results that are more in line with our history and
> expectations. We have a strong management team with a long-term track record
> of achieving profitable growth. We have also demonstrated the ability to
> remediate business that falls short of our targets and restrict business written in
> states and classes of business where the opportunity to achieve our underwriting
> targets is limited. The improvement in our 2011 accident year combined ratio
> from 100.7% as re-estimated at June 30, 2012 compared to 97.1% for the first six
> months of 2012 reflects the cumulative impact of rate increases and underwriting
> actions taken since 2009 as we move towards our target of achieving a 95.0%
> combined ratio. Our average calendar year combined ratio over the past five years
> has been 95.5% and GAAP book value per share has increased over 165% during
> this period.

184.     In the July 30, 2012 Press Release, the Company also revised its guidance for

2012 and projected that "net operating income to be in a range of $27 million to $30 million, a

GAAP combined ratio of 101.5% to 102.5% and gross written premium in a range of $970

million to $990 million. Achieving results within these ranges would result in net operating

income between $0.55 and $0.60 per diluted share."

185.     On July 31, 2012, the Company held its Q2 2012 Earnings Conference Call, on

which Defendants discussed the impact of the additional reserve charges for the most recent

quarter. During the Q&A session of the call, Defendant Cubbin attempted to explain the reasons

behind the unexpected $28.2 million reserve charges and emphasized that he did not anticipate further charges (with emphasis added):

> Q:    FBR & Co. Analyst - I guess I'll start with the question that is on the mind a lot of investors, and that's just kind of -- and you've covered it a little bit in the opening commentary. But just kind of getting a sense of where you feel like you are in the claims review process, and where your feel is on how far through you are in taking reserve true-ups, particularly in Workers' Comp and the GL area.

> A:    Cubbin - Yes, thanks, Randy. You know, we did very, ***very granular detailed analysis*** based on new information that we got in the second quarter. In the first quarter, we had certain information that we had to rely on, and we made our net ultimate loss estimates based upon, and that did change in the second quarter. We had much higher incurred loss pattern than we had seen in our historic results. So on the claims initiatives, those are pretty much already done.  And we do feel that, based on what our actuarial team saw, the feedback from our regional officers and our claims people, that we have done exactly what we needed to do. And we have booked their reserves at where the actuarial team feels comfortable. ***So we do not anticipate additional activity of the sort that we saw in the second quarter.***

186.    On August 9, 2012, the Company filed with the SEC its quarterly report for the period ended June 30, 2012 on a Form 10-Q signed by Defendant Spaun (the "Q2 2012 10-Q"). It contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The Company reported net earned premiums of $211.3 million, total revenues of $235.1 million, total expenses of $245.1 million and net loss of ($7.7 million) or ($0.15) per diluted share. The Company further reported total assets of $2.54 billion including goodwill of $121.0 million. The Company disclosed the following regarding an increase in net ultimate loss estimates, "For the three months ended June 30, 2012, we reported an increase in net ultimate loss estimates for accident years 2011 and prior of $28.2 million, or 3.2% of $879.1 million of net loss and LAE reserves at December 31, 2011."

Out of the $28.2 million charge, $16.5 million related to expenses in the Company's Commercial Multi-Peril/General Liability line of business, most of which related to Meadowbrook's Public Entity Excess Liability program.

187.     On August 17, 2012, the Company gave an investor presentation entitled "Second Quarter 2012 Update," which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  In that presentation, despite all of the above-referenced problems with the Company's loss reserves and expense charges, Defendants continued to tout the Company's "disciplined growth strategy" and "culture of disciplined underwriting, claims handling & reserving."  The investor presentation also touted that the Company's "balanced business model" allows it to "adapt to changing market conditions and deliver more predictable results."  The presentation further represented that the Company's "high quality investment portfolio is well matched to our loss reserves and generates a predictable stream of income."

188.     The statements referenced above in ¶¶180-187 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) despite increases in reserves, the Company's financial condition continued to deteriorate, and the Company still was inadequately reserved based upon its rapid expansion and altered risk profile; (2) the perceived profitability in certain lines of business, such as workers' compensation, was due to the ongoing failure to set loss reserves at levels that reflected the likelihood of potential liabilities; (3) reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (4) shortfalls in reserves were due to a lack of adequate internal controls to detect and correct loss reserve deficiencies, and were not the product of any purported initiatives focused on high

exposure claims; (5) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (6) the Company did not adhere to disciplined underwriting standards; (7) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (8) goodwill was materially overstated.

189.    The statements referenced above are also false and misleading, because Defendant Cubbin had no basis in fact for representing that, *inter alia*: (1) the Company could remediate losses by aggressively raising rates and shrinking business to maintain profits and position the Company for future profitability; (2) California Workers' Compensation business was demonstrating positive indicators, when he knew that certain parts of that business were generating losses that could lead to the termination of that business; and (3) the actuarial team felt comfortable with the booked reserves and that he did not anticipate additional claim loss activity like that which occurred in the second quarter.

**Defendants' False and Misleading Third Quarter 2012 Statements**

190.    On October 18, 2012, despite Defendant Cubbin's previous statements that the Company's reserves were under control, Meadowbrook issued a press release listing Defendant Spaun as a Company contact (the "October 18, 2012 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun, announcing that it would need to take yet another reserve charge.  This was the sixth consecutive quarter that the Company it announced an adverse reserve development.  Purportedly as a result of an increase in net ultimate loss estimates for 2011 and prior accident years, the Company reported that it expected to record a pre-tax expense/loss reserve charge of $31.4 million in the third quarter of 2012.  The Company stated that the expense charge reflected "higher than expected incurred loss activity in

accident years 2009, 2010 and 2011." Of the $31.4 million charge, $8.3 million came from the Company's Workers Compensation business line, $11.9 million came from the Commercial Multi-Peril/General Liability line and $11.0 million for Meadowbrook's Commercial Auto business.

191.     Defendant Cubbin made the following comments in the October 18, 2012 Press Release with respect to each of the business lines and respective reserve charges:

Workers' Compensation (Excluding Residual Markets)

With respect to workers' compensation, our largest line of business, we continue to see favorable overall underwriting trends. The average accident year combined ratio since 2010 was 101.5%. In California workers' compensation, the average combined ratio since 2010 is 98.9%. Our overall current accident year combined ratio for workers' compensation is 97.7%. This improvement reflects the impact of cumulative rate increases of 17.2% since 2009. While we continue to experience acceleration in the case reserving process and case reserve strengthening, the amount of acceleration and case reserve strengthening identified is less in this quarter than our previous estimates contemplated. Accordingly, we have increased our estimates for prior year losses. Paid loss severities remain more stable and claim frequencies have decreased due to earned rate increases. We view the paid loss severity and frequency trends, along with the rate increases that we have achieved as positive indicators for this business. In most states underwriting actions and rate increases have been effective and ultimate loss estimates on prior accident years have been stable.

Commercial Multi-Peril/General Liability

With respect to commercial multi-peril/general liability, our next largest line of business, while we continue to see favorable overall underwriting results, our ultimate loss estimates for prior years were slightly deficient. The average accident year combined ratio since 2009 was 94.8%. Our current accident year combined ratio is 93.9%. During the quarter, our claim managers continued to perform an exposure analysis on our larger exposure claims. This recent initiative was designed to identify higher exposure claims earlier and focus our investigation and defense strategy on claims with higher exposures. This may have led to a higher level of incurred losses than indicated by our historical development patterns.

Commercial Automobile

We continue to be disappointed with the overall results in this line of business which was about 15.5% of our net earned premium in 2011. The average accident year combined ratio since 2009 was 109.1%. Our current accident year combined ratio is 109.6%. These unfavorable results primarily reflect the impact of our Transportation program and a smaller segment of another program. The underwriting and rate actions are continuing to take hold as loss frequency in the 2012 accident year is down. Cumulative rate increases in the Transportation program mentioned above has been greater than 46% since 2010 and exposure base is down substantially. In addition, we no longer write auto physical damage coverage in that program. As these rate increases continue to earn in 2012, we expect improved current accident year results for this business.

Other Lines

Over the years we have demonstrated an ability to remediate programs that are not meeting our targets through a combination of underwriting and pricing actions. Although we have experienced increases in net ultimate loss estimates noted above, we have made significant headway in remediating where necessary. We will continue to earn premium in 2012 that reflects the cumulative rate increases and underwriting actions, which we expect to result in an improved combined ratio. Despite the prolonged soft market and lackluster economic growth, we have had an average combined ratio of 99.4% over the last 6 accident years and 2012 is at 99.6%. As we emerge from an underpriced environment to more adequate pricing levels we should see ongoing, incremental improvement in our overall underwriting results."

192.    After Meadowbrook announced its sixth consecutive quarterly reserve charge, on October 19, 2012, A.M. Best placed the "A- Rating" of Meadowbrook under review with negative implications (which implied a rating action was imminent). That day, A.M. Best issued a press release which stated the following:

A.M. Best Co. has placed under review with negative implications the financial strength rating (FSR) of A- (Excellent) and issuer credit ratings (ICR) of "a-" of the subsidiaries of Meadowbrook Insurance Group, Inc. (MIGI) (Southfield, MI) [NYSE: MIG], which operate under an intercompany reinsurance pooling agreement. A.M. Best also has placed under review with negative implications the ICR of "bbb-" of MIGI. (See below for a detailed listing of the companies and ratings.)

The under review status reflects MIGI's preliminary announcement that its third quarter 2012 results will be adversely impacted by an increase in its net ultimate loss estimates for 2011 and prior accident years. ***The negative implications reflect the reasonable likelihood that the ratings will be downgraded based on this***

> ***announcement, worse than expected operating results in 2012, the reduction in
> risk-adjusted capitalization levels and earnings prospects going forward***.

> The ratings will remain under review pending further discussions between A.M.
> Best and MIGI's management regarding various capital raising initiatives that are
> being explored, as well as an in depth view surrounding the degree and nature of
> the charges taken, any other action plans implemented by management and
> MIGI's ability to stem another instance of adverse reserve development, if it
> should arise.  (emphasis added)

193.     On October 19, 2012, RBC Capital Markets downgraded Meadowbrook to
"underperform", and cut its price target from $9.00 to $6.00 per share due to the Company's
ongoing reserve issues.

194.     On October 19, 2012, the Company held a conference call to discuss the impact of
the increase in net loss estimates for Q3 2012 and corresponding expense/reserve charge.  During
the conference call, Defendant Cubbin attempted to explain the reasons behind the unexpected
charges, stating that the Company was performing a new "initiative" regarding its largest claim
exposures: "During the quarter, our claim managers continued to perform an exposure analysis
on our larger exposure claims. This initiative was designed to identify earlier and focus on
investigation and expense strategy on claims with higher exposures. This may have led to a
higher level of incurred losses than indicated by our historical development patterns."   During
the call, in response to a question, Cubbin explained that the Company's new initiative and
reserve methodologies were in fact "more conservative" than past practices (with emphasis
added)

> Q:     KBW Analyst -  Yes, hi, thanks. So it sounded like you changed the focus
>        of your reserving methodologies. Can you kind of just go over that again?

> A:     Cubbin - Yes, I don't know that it's necessarily a change in focus. We
>        have seen incurred loss activity spike up versus historic levels. And as we
>        were studying that in the first, second and third quarters, we saw an
>        acceleration in the reserving pattern in a number of lines of business. So,
>        when the actuarial work was done in the first and second quarter, there

was some weighting given to that acceleration. We expected to see the incurred loss activity in the third quarter drop more substantially than it did, owing to the fact that we the development pattern had been accelerated. The incurred losses didn't drop as much as we had originally expected, which was built into the estimates last quarter. So we have weighted less than that acceleration, and therefore we have shifted up in the conservative range of our loss reserve pattern to a higher level that's closer to sort of an incurred development method -- or incurred development method. So the actual actuarial team is waiting that acceleration of the case reserve strengthening less this quarter than it had in the past. ***So that should be a more conservative position.*** (emphasis added).

Q:     KBW Analyst - Alright, so it's not a change of focus. It's just a change in the weighting of the different methodologies that you're using.

A:     Cubbin -  Yes, sir.

Q:     KBW Analyst - Okay, and can you give us an idea of, if they do have a range, where you are in the range at this point?

A:     Cubbin - Yes, whenever the ranges are built, they build them off the indications from the various actuarial methods. So you're always going to have a range.  ***And at this point what we've done is we've made the range more conservative, and we're at the best estimates of the middle of that more conservative range.*** (emphasis added).

Q:     FBR & Co. Analyst - And auto. Can you kind of size for us to give us an estimate of how far through you are in that review process? I mean is it an ongoing process? Or is there some way we can kind of get a sense of how much -- at what point will all the large cases be reviewed I guess is a simple way to ask it?

A:     Cubbin - That's a fair question. They have all been reviewed. And actually we have modified that initiative to be able to minimize the impact on accelerating the case reserving process, so we've changed that process to lessen the likelihood that it will accelerate the reserving pattern the way it has over the past few quarters.

Q:     FBR & Co. Analyst - And I'm sorry, could you just elaborate a little bit further? I didn't follow that. How did the process change that it would lead to less reserve volatility?

A:     Bob Cubbin - Well, the way the initiative was started was that everybody in the claims organization was to identify their top 10 exposure cases and report them to their boss, who would then report them to his boss all the

way on up to the corporate claims level. It was that process that we observed having accelerated the reserving process to a point where the ultimate probable cost of those claims was being put up more quickly than our historic pattern, where it would just have been the normal course of business, that occurring.  So we did observe an acceleration as a result of those larger exposed losses. And so the claims department has stopped that top 10 program and they are doing their own audits in the normal course of business to identify the source of higher exposure cases. ***So we think that that phenomenon should be coming to an end.*** (emphasis added).

Q:    FBR & Co. Analyst - But I guess would that mean that whether whatever the process, that the reserves are becoming more adequate, right? I mean you're making progress on getting past whatever -- for whatever reason a case was not properly trued up, if you will, whether it's through this large case review process or a normal kind of claims team underwriting or claims adjustment process. The net result for us would be the same, that you getting -- you are kind of passing through -- at this point most of that review process is over.

A:    Cubbin - ***Yes, we don't expect to see continued acceleration. So if we return to more normal preserving patterns, then our historic loss development factors will accurately reflect our expected ultimate.*** What happened here was we're using our normal development factors which did not have that acceleration expectation in it. And when that acceleration came through, it then -- in actuarial terms it compounded the problem, because if you increase a case reserve and the development factors are expected in the normal course have that case reserve developed in the future as opposed to today, then we're going to have higher overall ultimate losses. So changing the pattern is really what causes the confusion and the difficulty. Some of these changes are subtle and the historic patterns that we were using no longer apply, so we'll have to adjust for that. And I think that's part of the difficulty that we've had over the last few quarters is that the pattern changed and we have to adapt to that. (emphasis added).

195.    Defendant Cubbin's admission that the Company was at that time performing a "new initiative" that required everyone in the Company's claims organization to identify their Top 10 exposure cases is, at the very least, strong evidence of Defendants' recklessness with regard to prior period loss reserve judgments.

196.    After the Company's credit rating was put under review, the Company's shares fell $1.61 per share, or over 20%, to close on October 19, 2012 at $6.18 per share.

197.     On November 1, 2012, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting its Q3 2012 results (the "November 1, 2012 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun. The Company reported a net operating loss of ($27.2 million), or ($0.55) per diluted share, compared to net operating income of $9.4 million, or $0.18 per diluted share, in Q3 2011.   Net loss for Q3 2012 was ($26.6 million), or ($0.53) per diluted share, as compared to net income of $9.6 million, or $0.18 per diluted share, for Q3 2011.   As part of that announcement, the Company disclosed that after further review, it was recording **$42.9 million** of prior-period reserve additions ($11.5 million **more than** pre-announced on October 18th).   The Company stated that the expense charge reflected "higher than expected incurred loss activity in accident years 2009, 2010 and 2011."

198.     Commenting on the third quarter, Defendant Cubbin stated in the November 1, 2012 Press Release (with emphasis added):

> Since our October 18, 2012 announcement on third quarter 2012 reserve estimates, we have continued to study the variables that impacted our evaluation of reserve adequacy, which led us to conclude that we needed to increase prior accident year loss reserve estimates.  In doing so, we decided to rely more heavily on loss development and tail factors that give less weight to the pattern of accelerated case reserving we have observed over the last three quarters.  While there is evidence of the acceleration in the underlying case reserving pattern, we are recording ultimate loss estimates higher than previously announced and $19.8 million higher than the mid-point of the range of actuarial estimates calculated by our internal actuarial team and implied by that acceleration.  **With this level of ultimate loss estimates, we believe we have put this challenging period of reserve development behind us**.

The Company also revealed for the first time that it had terminated altogether some of its underperforming business lines, which related mostly to the Public Entity Excess Liability program:

> We have also determined that, with the capital situation we are addressing, the areas of our business that have been adversely impacting our results needed to be terminated. We have already notified the affected production sources of our decisions. Those programs are expected to generate approximately $75.9 million of gross written premium in 2012. The vast majority of our other business is performing well, and with additional rate increases and the underwriting actions already taken, along with a firmer pricing environment, we expect to return to profitability in the 4th quarter 2012 and into 2013.

199.    In the November 1, 2012 press release, the Company also revealed for the first time that, as a result of being put under review by A.M. Best, the Company had commenced the sale of a portion of its bond portfolio and had retained a consultant to assist it in reviewing a variety of statutory capital enhancement strategies.   With regard to guidance, the Company stated that "Management anticipates the Company will return to profitability in the fourth quarter of 2012 and will comment on 2013 expectations as the impact of capital enhancing initiatives are determined."

200.    On November 2, 2012, the Company held its Q3 2012 Earnings Conference Call, during which, despite the Company's most recent *$42.9 million* reserve charge, Defendant Cubbin once again touted Meadowbrook's reserving practices:

> [W]e have top [a] top notch claim handling team and aggressive case reserving practices.  We are confident that our reserves are properly evaluated and held at an appropriate level.  We believe that we have minimized the likelihood of adverse development through our reserving actions and through our underwriting and pricing actions.

During the conference call, Defendant Cubbin also stated that the Q3 2012 expense charge "was done to move us up in our range of estimates to where we are less likely to have additional reserve adverse development."  He also shed some additional light on the decision to terminate Meadowbrook's Public Entity Excess Book of Business:

> Our largest excess reserves are for the public entity excess book of business, where we have seen adverse development in recent years.  This program was recently terminated after many months of reviewing ways to remediate the

problem. The workers' compensation line of business had $17.5 million, or 4.7%, of adverse development in the quarter. Over 95% of this was from two reserving segments that are primarily California workers' compensation.

Defendant Cubbin also revealed that as a result of the Company's reserve problems and being put under review by A.M. Best, it had commenced a sale of a portion of its bond portfolio to realize gains targeted at $25 million so as to increase its statutory surplus.

201.    During the earnings conference call, defendant Cubbin avoided answering a question with regard to whether the Company had used an outside actuary firm to review Meadowbrook's reserves:

> Q:    Robert Farnam -  Okay.  And have the reserves been looked at by an outside actuary recently?
>
> A:    Cubbin – Our audit firm has to sign off on our financial statement every quarter and they look at the reserves as part of that process.

202.    On November 9, 2012, the Company filed with the SEC a quarterly report for the period ended September 30, 2012 on a Form 10-Q signed by Defendant Spaun (the "Q3 2012 10-Q"), which contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  For the three months ended September 30, 2012, the Company reported net earned premiums of $223.4 million, total revenues of $245.5 million, total expenses of $294.2 million and net loss of ($26.26 million) or ($0.53) per diluted share. It further reported total assets of $2.69 billion including goodwill of $121.0 million.  It disclosed the following regarding its reserve charges: "For the three months ended September 30, 2012, we reported an increase in net ultimate loss estimates for accident years 2011 and prior of $42.9 million, or 4.9% of $879.1 million of net loss and LAE reserves at December 31, 2011."  In the Q3 2012 10-Q, it also provided new information regarding its

terminated programs and revealed that its "public-entity excess workers' compensation program" was terminated on October 15, 2012.

203.     Defendants also reported that as of September 30, 2012, the Company had **$121.0 million of goodwill** recorded and had performed an interim goodwill impairment test, thereby expressly **reaffirming** that figure notwithstanding all the reserve and expense charges incurred to that point, as discussed *supra*.  Specifically, the Q3 2012 10-Q stated:

> As of September 30, 2012, the Company had $121.0 million of goodwill recorded. In accordance with accounting guidance, the Company concluded its reporting units to be agency operations and specialty insurance operations (SIO). As a result of operating results to date, the updated forecast of the fair value of the SIO reporting unit has decreased. As such, the Company performed an interim goodwill impairment test as of September 30, 2012, updating its cash flow projections and related assumptions from the analysis performed as of October 1, 2011. As a result of completing this analysis, the SIO's fair value exceeded its carrying value. Subsequent to September 30, 2012, we have identified certain additional indicators of potential goodwill impairment in the SIO reporting unit. These indicators include a notable decrease in the stock price of the Company as well as the A.M. Best review with negative implications. In connection with our annual impairment test of goodwill as of October 1, 2012, we will consider these indicators in connection with the SIO's fair value.

204.     Defendants' statements reaffirming goodwill were false and misleading and/or omitted material facts, because on or before November 9, 2012, Defendants knew or recklessly disregarded that, in view of Meadowbrook's deteriorating loss experience, increasing loss reserve charges, and declining future revenues from existing and terminated lines of business – as discussed *supra* – that its forecasts would no longer support the value of the goodwill on the Company's books, such that they were impaired under clear and unambiguous GAAP standards. Basic GAAP accounting principles, well understood by Defendants, required Meadowbrook to write down goodwill assets at the time they were impaired, *i.e.* on or before November 9, 2012. Yet, Defendants knew that a proper and timely disclosure of the impairment of goodwill would cause a decrease in the value of Meadowbrook stock and would cause the Company to violate

"financial covenants" applicable to its credit facilities.  Thus, by this time Defendants knew or blinded themselves to the necessity of writing down the Company's goodwill and deliberately failed to report any impairment.

205.     This falsehood temporarily perpetuated some of the inflation in the Company's stock price, preventing a total correction to the fraud at issue.

206.     On November 27, 2012, Meadowbrook filed a Form 8-K with the SEC, signed by Defendant Spaun, which contained an Investor Presentation entitled "Third Quarter 2012 Update" and an "Investor Supplement."  In the presentations, despite its reserve problems, the Company continued to tout its "culture of disciplined underwriting, claims handling & reserving."

207.     As part of the November 27, 2012 Investor Supplement, the Company attempted to explain the reasons for its large reserve charges throughout 2012.  On a slide titled, "What Happened? - What caused the prior year development?," the Company explained that as of February 15, 2012, claim adjusters were required to report their "Top Ten Exposure" claims to their managers, who then presented their top ten exposure lists up the line to corporate claims. Eventually, 750 claims were purportedly escalated to the corporate claims department. Meadowbrook described the "unintentional effect" of the Top Ten Exposure Program was an acceleration in the Company's reserves.  The Investor Supplement also stated that, "we have confidence in our reserves…we are confident that we have a strong reserve position."

208.     The statements referenced above in ¶¶190-191, 194, 197-203, 206-207 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) despite increases in reserves, the Company's financial condition continued to deteriorate, and the Company still was inadequately reserved

based upon its rapid expansion and altered risk profile; (2) the perceived profitability in certain lines of business, such as workers' compensation, was due to the ongoing failure to set loss reserves at levels that reflected the likelihood of potential liabilities; (3) reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (4) shortfalls in reserves were due to a lack of adequate internal controls to detect and correct loss reserve deficiencies, and were not the product of any purported initiatives focused on high exposure claims or the result of higher-than-expected losses that deviated from historical patterns; (5) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (6) the Company did not adhere to disciplined underwriting standards; (7) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (8) goodwill was materially overstated.

209.     Additionally, Defendant Cubbin's statements referenced above were false and misleading and/or omitted material information, because, *inter alia*: (1) Defendant Cubbin had no basis in fact for representing that the Company could remediate programs that are not meeting targets with a combination of underwriting and pricing actions and expect ongoing incremental improvement in overall underwriting results; and (2) Defendant Cubbin had no factual basis for representing that the Company was confident that its reserves were properly evaluated and held at an appropriate level and that the likelihood of adverse development was minimized through reserving, underwriting and pricing actions.

**Defendants' False and Misleading Fourth Quarter 2012 and Year-End Statements**

210.    On February 12, 2013, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting on the Company's fourth quarter 2012 and year-end 2012 results (the "February 12, 2013 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.   For Q4 2012, the Company reported that net operating income for the quarter was $47,000, or $0.00 per diluted share, compared to $8.5 million, or $0.17 per diluted share in Q4 2011.   Net income for Q4 2012 was $38.0 million, or $0.76 per diluted share compared to $9.0 million, or $0.18 per diluted share, for Q4 2011. For the full year 2012, the Company reported a net operating loss of ($28.4 million), or $0.57 per diluted share, compared to net operating income of $40.3 million, or $0.77 per diluted share in 2011.  Net income for the full year 2012 was $11.7 million, or $0.23 per diluted share, compared to net income of $43.0 million, or $0.82 per diluted share in 2011.    The GAAP combined ratio for the full year 2012 was 111.4%, compared to 99.8% in 2011.

211.    Commenting on the results, Defendant Cubbin emphasized in the February 12, 2013 Press Release that Meadowbrook's loss reserves were "stabilizing" (with emphasis added):

> We are committed to our shareholders, partners, agents, customers, and employees to solidify our A.M. Best rating. We have made progress in enhancing our statutory surplus and reducing our required capital by harvesting $52.1 million of gains embedded in our investment portfolio, entering into a quota share reinsurance agreement and terminating underperforming business. With these actions, our statutory surplus has increased by $79.0 million in the last quarter and our net premium leverage ratio decreased from 2.5 to 1.0 to 1.9 to 1.0. ***We are also pleased that our loss reserves are stabilizing and that rate increases continue to outpace loss trends.***

212.    On February 13, 2013, the Company held its Q4 2012 Earnings Conference Call. During the call, Defendant Cubbin summarized the fourth quarter 2012 results and emphasized once again that reserves were "stabilizing" (with emphasis added):

In summary, we experienced an improving loss ratio picture in the fourth quarter and we got back to where we can and need to be; significant progress had been made. We are encouraged by the improving trends in our accident year loss ratios, *the stabilizing of older year reserves*, rate increases being achieved and the benefit of collectively reducing premium volumes in underperforming segments of the business. We are confident that the appropriate corrective action has been taken and that continued evidence of the targeted improvements will emerge in 2013 and beyond. (emphasis added).

213.     On March 8, 2013, Meadowbrook filed with the SEC its Form 10-K report for the year ended December 31, 2012 (the "2012 10-K"), which was signed by Defendants Cubbin, Spaun and the Company's directors and accompanied by SOX certifications signed by Defendants Cubbin and Spaun.   In the 2012 10-K, Defendants concluded that the Company maintained effective internal controls over financial reporting and portrayed the Company as safe, conservative and efficient with regard to its various business lines.   The Company also touted its disciplined reserve process.   Once again, in the 2011 10-K, the Company explained that it had a culture of disciplined claims handling and reserving:

> *Culture of Disciplined Underwriting, Claims Handling & Reserving*:
> Our associates have significant experience across all functions of our business including underwriting, claims handling, and reserving.
>
> ***
>
> ***We have also built a robust control environment where underwriting trends are closely monitored, which enables us to proactively manage our business and deliver consistent, profitable results. Finally, we have built a strong claims handling function internally that plays a substantial role in claims management and handling activities***.

214.     The 2012 Form 10-K also falsely touted Meadowbrook's claims administration and handling:

> *Claims Administration and Handling*. We provide substantially all claims management and handling services for workers' compensation and most other lines, such as property, auto liability, professional liability, and general liability. Our claims handling is managed by our field offices. ***Our corporate claims department monitors the results through self-audits, corporate claim audits,***

*internal controls, and other executive oversight reports.* With the exception of MFH, with respect to whom we have direct access to their paid and case reserve loss data and perform corporate claims audits, we handle substantially all claims functions for the majority of the programs we manage. Our involvement in claims administration and handling provides benchmarks and valuable feedback to program managers in assessing the client's risk environment and the overall structure of the program.

215.　　In addition, in the 2012 10-K, the Company continued to falsely emphasize that it performed a "complete and detailed reserve analyses each quarter" (with emphasis added):

*In developing claim and claim adjustment expense reserve estimates, we perform a complete and detailed reserve analyses each quarter*. To perform this analysis, the data is organized at a "reserve category" level.  A reserve category can be a line of business such as commercial automobile liability, or it may be a particular geographical area within a line of business such as California workers' compensation. The reserves within a reserve category level are characterized as either short tail or long tail. About 97% of our reserves can be characterized as coming from long tail lines of business. For long tail business, several years may lapse between the time the business is written and the time when all claims are settled. Our long-tail exposures include workers' compensation, commercial automobile liability, general liability, professional liability, products liability, aviation liability, excess, and umbrella. Short-tail exposures include property, commercial automobile physical damage, a portion of ocean marine, and inland marine. The analyses generally review losses both gross and net of reinsurance.

216.　　In the 2012 10-K, the Company reported that for the twelve months ended December 31, 2012, it had an $85.5 million adverse development on prior years loss reserves for accident years 2011 and prior ($33 million, or 38.6% of the $85.5 million related to Accident Year 2011;  $22.5 million, or 26.3% of the $85.5 million related to Accident Year 2010; $18.7 million, or 21.9% of the $85.5 million related to Accident Year 2009 and $11.3 million, or 13.2% of the $85.5 million related to Accident Year 2008 and prior).

217.　　In the 2012 10-K, with respect to Meadowbrook's Workers' Compensation and Commercial Multiple Period/General Liability business lines, the Company stated in relevant part:

*Workers' Compensation Excluding Residual Markets*

During the year, we experienced an acceleration in the claim handling process. Although the acceleration represents a deviation from standard loss development patterns, it also resulted in the recognition of some claim liabilities that were higher than anticipated in our previous reserving estimates. This, in turn, led to an increase in the net ultimate loss estimates on prior accident years during the first three quarters. The acceleration began to dissipate in the fourth quarter and reserves began to stabilize.

*Commercial Multiple Peril / General Liability*

The net ultimate loss estimates for accident years 2011 and prior in the commercial multi-peril/general liability line of business increased $34.4 million, or 9.7%.

\*\*\*

Of the $34.4 million increase in prior accident year net ultimate loss estimates, $15.0 million was related to the excess liability program. This program was cancelled in October 2012.

During the year, our claim managers continued to perform an exposure analysis on our larger exposure claims. This recent initiative was designed to identify higher exposure claims earlier and focus on our investigation and defense strategies, which led to a higher level of incurred losses than indicated by our historical development patterns. While this acceleration represents a deviation from standard loss development patterns, it also resulted in the recognition of some claim liabilities that were higher than anticipated in our previous reserving estimates.

218.    The 2012 10-K also reported the following regarding its goodwill valuation analysis, thereby reaffirming its then-stated goodwill figures:

On October 1, 2012, the Step 1 analysis resulted in fair value of the reporting units in excess of their carrying value and accordingly, the Company did not perform Step 2. Fair value exceeded carrying value by 3% in the specialty insurance operations and 150% in the agency operations. Had fair value in Step 1 fallen below carrying value, the Company would have needed to perform a Step 2 analysis, which may have resulted in impairment of goodwill.

Subsequent to the annual impairment test date, the Company considered potential indicators of impairment that would suggest further analysis. The Company considered its market capitalization decline during the fourth quarter as a trigger for performing an interim Step 1 analysis. This subsequent analysis resulted in fair values of the reporting units in excess of their carrying value and accordingly, the Company did not perform Step 2. Fair value exceeded carrying value by 8%

in the specialty insurance operations and 109% in the agency operations. Had fair value in Step 1 fallen below carrying value, the Company would have needed to perform a Step 2 analysis, which may have resulted in impairment of goodwill.

219.     Based on the Company's goodwill analysis, as of December 31, 2012, Defendants continued to report *$121.0 million of goodwill* on Meadowbrook's books while publicly stating that they had determined that there was no impairment.

220.     The statements referenced above in ¶¶210-219 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) despite increases in reserves, the Company's financial condition continued to deteriorate, and the Company still was inadequately reserved based upon its rapid expansion and altered risk profile; (2) the perceived profitability in certain lines of business, such as workers' compensation, was due to the ongoing failure to set loss reserves at levels that reflected the likelihood of potential liabilities; (3) reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (4) shortfalls in reserves were due to a lack of adequate internal controls to detect and correct loss reserve deficiencies, and were not the product of any purported initiatives focused on high exposure claims or the result of higher-than-expected losses that deviated from historical patterns; (5) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (6) the Company did not adhere to disciplined underwriting standards; (7) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (8) goodwill was materially overstated.

**Defendants' False and Misleading First Quarter 2013 Statements**

221.     By the first quarter of 2013, Defendants had successfully persuaded A.M. Best and the market that Meadowbrook had "stabilized" its reserve issues.   As a result, on April 19, 2013, A.M. Best announced that it had removed its "under review" status and affirmed Meadowbrook's financial strength rating of A- (Excellent).

222.     On April 30, 2013, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting its first quarter 2013 results (the "April 30, 2013 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun. The Company reported for the first quarter 2013 net operating income of $6.9 million, or $0.14 per diluted share.   Net income for Q1 2013 was $7.1 million, or $0.14 per diluted share compared to $8.1 million, or $0.16 per diluted share, for Q1 2012.  The Company also reported a pre-tax expense/reserve charge of $3.6 million from its "discontinued public entity excess program."  Despite the adverse development, Defendant Cubbin continued to falsely emphasize in the April 30, 2013 Press Release that the Company's reserve process had stabilized (with emphasis added):

> Our first quarter results were consistent with our expectations. We are committed to our business plan and returning to our historic levels of underwriting profitability in the near term. We have enhanced our statutory surplus, ***stabilized reserves***, continued to achieve rate increases in excess of loss ratio trends, and terminated underperforming programs and business.

223.     On May 1, 2013, the Company held its Q1 2013 Earnings Conference Call. During the call, Defendant Spaun reviewed the Company's Q1 2013 financial results and explained in detail the impact of the Swiss Re quota agreement on the Company.  As a result of Meadowbrook's reserve issues and the AM Best review, the Company "ceded $91.4 million of unearned premium to Swiss Re at December 31, 2012, and another $29.7 million of ceded written premium in [Q1 2013]."

224.     During the call, Defendant Cubbin once again falsely emphasized how the reserve

process had purportedly stabilized and that the future looked strong (with emphasis added):

> We have made a lot of progress on our plans to return to our historic pattern of stable underwriting and operating results. We have taken a lot of [substitute] actions to enhance our statutory surplus, ***reserves have stabilized***, we have continued to achieve rate increases in excess of loss ratio trends, and we terminated our reduced premium on underperforming areas of our business.
>
> While these actions have returned us to profitability in the first quarter, excluding the impact of the Swiss Re quota share, operating profit was $9.1 million, or $0.18 per share, up from $7.5 million or $0.15 per share in the first quarter of 2012. We have increased statutory surplus by $74.9 million during the quarter through the net proceeds of our recent debt offering, and from operating profit. This lowered our net premium to surplus leverage ratio.

225.     As part of the Q&A session, Defendant Cubbin focused on the stability of the

Company's reserves (with emphasis added):

> Q:     Unidentified Analyst -  Just wanted to follow up on the conversations with A.M. Best, if you could talk about the reserve increase, what years, where they recent years, or later years were that is coming up and maybe what drove that increase for this quarter?
>
> A:     Bob Cubbin - ***Yes, really the story on reserves is stable***. We did have the public entity [access] program that we put into run off. That is really where we had about $4 million of development. So all the other lines of business combined were actually slightly favorable. Of particular note the work comp business was stable, the auto liability is showing more stability as well. ***So, pretty much everywhere other than in the public entity [access] we had fairly consistent stable reserves there***.  You know, the public entity [access] program as we said when we discontinued it, it did have a little more volatility in the outcomes than we wanted to tolerate longer term. That was one of the reasons why we terminated it.

226.     On May 10, 2013, the Company filed with the SEC a quarterly report for the

period ended March 31, 2013 on a Form 10-Q signed by Defendant Spaun (the "Q1 2013 10-

Q").  It contained signed SOX certifications by Defendants Cubbin and Spaun stating that the

financial information contained therein was accurate and disclosed any material changes to the

Company's internal control over financial reporting.  For the three months ended March 31,

2013, the Company reported net earned premiums of $170.5 million, total revenues of $191.6 million, total expenses of $183.2 million and net income of $7.1 million or $0.14) per diluted share. The Company disclosed the following regarding its reserve charges: "For the three months ended March 31, 2013, we reported an increase in net ultimate loss estimates for accident years 2012 and prior of $3.6 million, or 0.3% of $1.1 billion of net loss and LAE reserves at December 31, 2012." The Company further reported total assets of $2.85 billion, including **no change to its reported goodwill of $121.0 million**.

227.     On June 11, 2013, the Company filed a Form 8-K with the SEC, signed by Defendant Spaun, which contained an Investor Presentation for the First Quarter 2013 and an Investor Supplement. In them, Meadowbrook continued to tout its "culture of disciplined underwriting, claims handling & reserving." The Investor Supplement repeated the majority of the November 27, 2012 presentation material, discussed *supra*.

228.     The statements referenced above in ¶¶222-227 were each materially false and misleading when made, because Defendants failed to disclose and/or misrepresented the following material facts: (1) despite increases in reserves, the Company's financial condition continued to deteriorate, and the Company still was inadequately reserved based upon its rapid expansion and altered risk profile; (2) the perceived profitability in certain lines of business, such as workers' compensation, was due to the ongoing failure to set loss reserves at levels that reflected the likelihood of potential liabilities; (3) reserves and surplus were still being manipulated to boost earnings, and thus, the Company's net operating income was materially overstated, and the true risks to investors of inadequate reserves and surplus were concealed; (4) shortfalls in reserves were due to a lack of adequate internal controls to detect and correct loss reserve deficiencies, and were not the product of any purported initiatives focused on high

exposure claims or the result of higher-than-expected losses that deviated from historical patterns; (5) the Company's claims handling standards were not adequately monitored or controlled and did not provide accurate feedback to program managers; (6) the Company did not adhere to disciplined underwriting standards; (7) the Company had not been selective in its approach to premium growth or product diversification, but instead had increased its concentration in certain riskier geographical areas and lines of business; and (8) goodwill was materially overstated.

229.      Additionally, Defendant Cubbin's statements were false and misleading and/or omitted material facts, because Defendant Cubbin had no basis in fact for his February 2013 press release and conference call statements that loss reserves were stabilizing and that appropriate corrective action had been taken and that continued evidence of targeted improvements will emerge in 2013 and beyond, because Defendants had put in place a loss estimation process that was designed to understate future claim losses.

**Defendants' False and Misleading Second Quarter 2013 Statements**

230.      On July 30, 2013, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting its Q2 2013 results (the "July 30, 2013 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  The Company reported a Q2 1013 net operating loss of ($6.7 million), or ($0.13) per diluted share, compared to a net operating loss of ($1.2 million, or $0.02) per diluted share, in Q2 2012.   It reported Q2 2013 net loss of ($11.5 million), or ($0.23) per diluted share, as compared to a net loss of ($7.7 million), or ($0.15) per diluted share, for Q2 2012.  The Q2 2013 results included a $26.5 million additional reserve charge.  The Company explained that out of the $26.5 million, $21.4 million included a pre-tax adjustment to net ultimate loss estimates for accident years 2012 and $5.2

million from an adverse reinsurance arbitration award.  The Company also reiterated is prior-reported goodwill of $121.0 million.

231.     Commenting on the results, Defendant Cubbin stated in the July 30, 2013 Press Release (with emphasis added):

> After a decent, but not great first quarter in 2013, wherein we showed operating income of $0.14 per share or $6.9 million, the second quarter was negatively impacted by an unexpected adverse reinsurance arbitration result, development on prior accident year reserves relating to an isolated territory in the discontinued business and from an above average level of storms in the second quarter. Our change in prior accident year ultimate reserve estimates on ongoing business was slightly favorable in the second quarter.  We are optimistic that the actions taken in 2012 and in the first quarter of 2013 to enhance our statutory surplus position, increase our capital adequacy and lower our gross and net written premium to statutory surplus leverage ratios, and solidify pricing adequacy positions us well for the second half of 2013 and 2014.

232.     On July 31, 2013, the Company held its Q2 2013 Earnings Conference Call.   In announcing the Company's Q2 2013 results, Defendant Cubbin explained that Meadowbrook took a $19.8 million charge from a discontinued territory within the California Workers' Compensation business.  During the call, Defendant Cubbin stated, "In that one territory in California, we have identified slower reporting, longer durations, and higher average incurred losses, and therefore non-renewed the business beginning midway through 2012."  Defendant Cubbin failed to explain which California territory was causing the problem or which programs were associated with it, but falsely maintained that this territory was an aberration from the rest of the Company's Workers' Compensation book of business.  Cubbin explained that prior to the Company's decision to terminate, Meadowbrook had been writing approximately $35 million annually in Workers' Compensation premium in that territory.

233.     During the July 31, 2013 call, Defendant Cubin was also asked the following question regarding goodwill and gave the following false response (with emphasis added):

Analyst:  I had a question about the goodwill.  Is there any chance of a goodwill impairment at this point for anything?

Cubbin:  *Doug, we do a goodwill analysis periodically as events require, and the most recent goodwill analysis we did, we passed*.

234.     The second July 30, 2013 Press Release and Q2 2013 Earnings Conference Call revealed to the investing public, analysts and A.M. Best much of the false and misleading information that had been previously misrepresented and concealed by Defendants.  It became clearer that Meadowbrook was unable to monitor its business or estimate its future losses as it repeatedly claimed that it could.  Thus, on July 31, 2013, Meadowbrook's common stock declined $0.70 per share and closed at $7.59 per share, on high volume of over 1.4 million shares.

235.     That Defendants' false statements were nevertheless effective in perpetuating a portion of the stock price inflation, however, is evidenced by the fact that A.M. Best had removed its "under review" status and affirmed the Company's rating after the first quarter, on April 19, 2013.  Toward that end, the Q2 2013 misrepresentations and omissions by Defendants referenced above in ¶¶230-233 continued to conceal the full truth about Meadowbrook's financial condition, including:

(a)  statements that financial results in Q2 2013 suffered from temporary or extraordinary events including "an unexpected adverse reinsurance arbitration,"  "development on prior accident year reserves relating to an isolated territory in the discontinued business, and storms.  Likewise, the statement describing the negative impact on prior year loss reserves for a particular geographical region of the previously terminated portion of the California Workers' Compensation business also falsely implied that this was an isolated anomaly.  These statements were materially misleading because they falsely imply that the Company, despite the losses incurred in the quarter, was still managing the business toward recovery.  In fact, the $21.4 million adjustment to net ultimate loss estimates for accident years 2012 and prior was not an aberration and Defendants' statements continued to conceal the fact that Meadowbrook could not or would not monitor its business and properly estimate loss reserves;

(b) as late as July 31, 2013, Defendant Cubbin continued to misrepresent the status of Meadowbrook's goodwill asset of $121.0 million, when he affirmed that that goodwill was not impaired and that the Company does impairment analysis "as events require" and that "we passed" the "most recent goodwill analysis." This was false and misleading because Defendants knew or recklessly disregarded that the goodwill was impaired at least by 2012, but managed loss reserves and cash flow projections to assure that no detailed analysis would reveal the impairment.

**The Full Truth Finally Emerges**

236.    On August 2, 2013, Meadowbrook was downgraded by A.M. Best.  A.M. Best cited several specific reasons for its downgrade, including the $21.4 million prior year adverse loss reserve and discontinuance of a territory in the Company's California workers' compensation line.  AM Best issued the following press release entitled "A.M. Best Downgrades Ratings of Meadowbrook Insurance Group, Inc. and Its Subsidiaries":

> A.M. Best Co. has downgraded the financial strength rating (FSR) to B++ (Good) from A- (Excellent) and issuer credit ratings (ICR) to "bbb+" from "a-" for the subsidiaries of Meadowbrook Insurance Group, Inc. (MIGI) (Southfield, MI) [NYSE: MIG], which operates under an intercompany reinsurance pooling agreement. A.M. Best also has downgraded the ICR to "bb+" from "bbb-" for MIGI. The outlook for the FSR has been revised to stable from negative, while the outlook for the ICRs is negative. (See below for a detailed listing of the companies and ratings.)

> The rating downgrades take into consideration MIGI's second quarter 2013 earnings announcement and the weaker than anticipated results due in large part to $21.4 million of prior year adverse loss reserve development and $8.2 million of pre-tax losses (on prior years) the result of adverse reinsurance arbitration. In the second quarter of 2013, MIGI reported a net operating loss of $4.4 million.

> According to MIGI's management, $19.8 million of prior year development stemmed from a discontinued territory within the California workers' compensation line. At the same time, MIGI experienced above average storm losses of $12.9 million in the same quarter and an unexpected loss in an arbitration hearing over ceded losses. The rating actions follow the negative outlook that was assigned to MIGI and its subsidiaries at the time A.M. Best affirmed its ratings in April along with the likelihood of potential negative rating actions if further adverse reserve development occurred.

> Due to A.M. Best's concerns regarding MIGI's overall reserve adequacy and the potential for future adverse development, the negative outlook on the ICRs has been maintained. This applies to both continued and discontinued lines, which

reflects additional concerns A.M. Best has regarding the ultimate development on some of MIGI's more recent accident years. A.M. Best will continue to monitor MIGI's capitalization to ensure that it remains within an acceptable range for its current rating level.

237.    On the news of the A.M. Best downgrade, Meadowbrook common stock declined $1.00 per share and closed at $6.74 per share on Monday, August 5, 2013, on high volume of over 3.4 million shares or nearly nine times the average daily volume.

238.    On that same day, the Company issued a press release commenting on A.M. Best's decision to downgrade its rating.  Defendant Cubbin stated, "We were very disappointed by today's decision by A.M. Best to downgrade our rating to B++ (stable)."  Defendant Cubbin did not disclose that the A.M. Best August 2, 2013 downgrade would be considered a triggering event resulting in the need to perform an interim impairment review of goodwill.  Instead, Defendant Cubbin disclosed that the Company needed to "make arrangements with an A rated insurance company to issue policies in those programs and lines of business for which such a rating is required."

239.    On August 9, 2013, when Defendants knew that the Company could no longer continue to report overstated goodwill, Meadowbrook announced that it has filed a Form 12b-25 with the SEC to allow it to file Form 10-Q for the period ending June 30, 2013 by August 14, 2013.  On this news, Meadowbrook securities declined a further $0.19 per share or over 2%, to close at $6.60 per share on August 12, 2013.

240.    On August 14, 2013, the Company filed with the SEC a quarterly report for the period ended June 30, 2013 on a Form 10-Q signed by Defendant Spaun (the "Q2 2013 10-Q"), which contained signed SOX certifications by Defendants Cubbin and Spaun stating that the financial information contained therein was accurate, and disclosed any material changes to the Company's internal control over financial reporting.  As part of the filing, the Company

announced that ***it would take a non-cash impairment of goodwill of $115.4 million in the three months ended June 30, 2013***. The impairment charge related to Meadowbrook's "Specialty Insurance Operations."  The charge ***wiped out 95% of the Company's goodwill on its balance sheet*** in a single blow and ***caused the Company to violate financial covenants applicable to the certain credit facilities***.   Specifically, the goodwill charge caused the Company to violate loan covenants in the August 2012 Credit Facility, including (a) the minimum consolidated net worth covenant of $473.9 million and (b) maximum permitted consolidated leverage ratio of 0.35 to 1.00.

241.    In the Company's Q2 2013 10-Q, Meadowbrook explained that the reduction of goodwill reduced the entire amount carried within its Specialty Insurance Operations segment, which included ProCentury.   The Company previously defined its "Specialty Insurance Operations" as follows (with emphasis added):

> The specialty insurance operations segment, which includes insurance company specialty programs and fee-for-service specialty or managed programs, focuses on specialty or niche insurance business. Specialty insurance operations provide services and coverages tailored to meet specific requirements of defined client groups and their members. These services include risk management consulting, claims administration and handling, loss control and prevention, and reinsurance placement, along with various types of property and casualty insurance coverage, including workers' compensation, commercial multiple peril, general liability, commercial auto liability, excess and surplus lines, environmental, garage keepers, surety, legal, professional liability, errors & omissions, inland marine, and other lines of business. Insurance coverage is provided primarily to associations or similar groups of members and to specified classes of business of the Company's agents. The Company recognizes revenue related to the services and coverages the specialty insurance operations provides within seven categories: net earned premiums, management fees, claims fees, loss control fees, reinsurance placement, investment income, and net realized gains (losses).   ***The Company included the results of operations related to ProCentury within the specialty insurance operations***.

242.    On the news of Meadowbrook's impairment charge the Company's shares fell $0.20 per share to $6.36 per share on August 15, 2013.

243.    On August 23, 2013, Meadowbrook was forced to obtain a waiver from members of the lending group under the August 2012 Credit Facility.  As previously disclosed, the Company was in default on two of its financial covenants, including its net worth covenant which were triggered from the goodwill write-down.

244.    On September 20, 2013, the Company announced that it has entered into an amendment of its August 2012 Credit Facility.  Among other things, the amendment reduced the available revolving credit commitments under the August 2012 Credit Facility and modified certain covenants to resolve technical defaults that arose in connection with the Company's goodwill impairment.

245.    On November 6, 2013, the Company held its Q3 2013 Earnings Conference Call, during which Defendant Cubin stated, "To reduce the inherent volatility in reserves and reduce the likelihood of future loss development in 2014 and beyond, we have added a level of conservatism in the current accident year reserves." Defendant Cubbin was asked whether the Company commenced a full-fledged independent actuarial review at year-end.   Defendant Cubbin responded, "Yes, we generally do."

246.    On February 18, 2014, Meadowbrook issued a press release listing Defendant Spaun as a Company contact and reporting on the Company's fourth quarter 2013 and year-end 2013 results (the "February 18, 2014 Press Release'), which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spaun.  For the fourth quarter 2013, the Company reported a net loss of $11.9 million, or $0.24 per diluted share, for the three months ended December 31, 2013 compared to net income of $38.0 million, or $0.76 per diluted share, for Q4 2012.  The Company also reported a net loss of $112.3 million, or $2.25 per diluted share, for the year ended December 31, 2013 compared to net income of $11.7 million, or $0.23 per diluted share,

for the year ended December 31, 2012. Once again, the fourth quarter results included a pre-tax

increase in net ultimate loss estimates for accident years 2012 and prior of $31.4 million. In an

attempt to once again spin the new reserve issues, commenting on the Q4 2013 loss reserve

expense, Defendant Cubbin stated in the February 18, 2014 Press Release:

> We are pleased with the stabilization in our workers' compensation reserves and
> on-going admitted program business. Our excess and surplus lines division
> experienced unfavorable development in the fourth quarter of 2013, primarily in
> the accident years 2010, 2011 and 2012. This development was caused by the
> persistent soft market pricing conditions in the excess and surplus lines market
> and competitive pressures from traditional admitted carriers in those accident
> years. During that period of time, rates were decreasing and the pool of available
> excess and surplus lines policies was decreasing as the admitted carriers
> continued to write business that would normally have remained in the E&S
> market.

247.    Following the release of the Company's 2013 fourth quarter results, on February

21, 2014, A.M. Best downgraded Meadowbrook again. In a press release issued that day, A.M.

Best stated the following (with emphasis added):

> A.M. Best has downgraded the issuer credit rating (ICR) to "bbb" from "bbb+"
> and affirmed the financial strength rating (FSR) of B++ (Good) for the
> subsidiaries of Meadowbrook Insurance Group, Inc. (MIGI) (Southfield, MI)
> [NYSE: MIG], which operate under an intercompany reinsurance pooling
> agreement. A.M. Best also has downgraded the ICR to "bb" from "bb+" for
> MIGI. The outlook for the FSR has been revised to negative from stable, while
> the outlook for the ICRs remains negative. (See below for a detailed listing of the
> companies and ratings.)
>
> These rating actions take into consideration MIGI's fourth quarter and full year
> 2013 earnings announcement, which resulted in a net operating loss of $11.9
> million for the quarter and a net loss of $112.3 million recorded for the full year.
> While a significant portion of this full year operating loss stems from a non-cash
> goodwill impairment charge of $101.6 million recorded during the second quarter,
> these rating actions consider the additional $31.4 million of adverse reserve
> development reported in the quarter which, again, was outside of management's
> expectations.
>
> While leverage and risk-adjusted capitalization remain adequate for the current
> rating levels and is not a significant rating concern at this time, A.M. Best will

continue to monitor MIGI's capitalization to ensure that it remains within an acceptable range for its current rating level.

For the full year 2013, MIGI reported adverse reserve development of $68.4 million, of which $41.6 million was attributable to legacy business that was previously terminated and placed into run-off (including the impact of the arbitration award in the second quarter). In addition, MIGI reported an additional $26.8 million of adverse development in its excess and surplus lines unit on business recently written in accident years 2010, 2011, and 2012.

The negative outlook continues to reflect A.M. Best's ongoing concerns regarding MIGI's overall reserve adequacy and the potential for future adverse development, especially given the ongoing development on legacy business and the recent development on some of MIGI's more recent books of business. While the charges recorded during the fourth quarter were not significant given the overall level of reserves, it is another quarter of negative news. In addition, the recent adverse development on ***MIGI's excess and surplus lines business further erodes confidence that management has successfully walled off adverse reserve development on a going-forward basis***.

Positive rating actions for MIGI are unlikely in the near to medium term. Key factors that could result in further negative rating actions include any additional adverse development in its reserves, prolonged unprofitable underwriting and operating results, a significant or sustained decline in its risk-adjusted capitalization and/or deterioration in its financial strength.

The FSR of B++ (Good) has been affirmed and the ICRs downgraded to "bbb" from "bbb+" for the following subsidiaries of Meadowbrook Insurance Group, Inc.: Star Insurance Company, Century Surety Company, Savers Property and Casualty Insurance Company, ProCentury Insurance Company, Williamsburg National Insurance Company and Ameritrust Insurance Corporation

## **DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES**

248.    Throughout the Class Period, Meadowbrook repeatedly violated GAAP by misrepresenting its loss reserves and net income and by failing to write-down goodwill in a timely manner, among other things. Moreover, throughout the Class Period, Meadowbrook repeatedly violated GAAP by misrepresenting its internal controls, reporting they were effective when in fact its internal controls were materially flawed such that the Company was unable to

accurately and reliably set loss reserves.  Accordingly, Meadowbrook's financial statements were unreliable, inaccurate and should not have been trusted.

249.    GAAP consists of the rules, conventions, and practices recognized and employed by the accounting profession for the preparation of financial statements.  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The FASB's mission is "to establish and improve standards of financial accounting and reporting that foster financial reporting by nongovernmental entities that provides decision-useful information to investors and other users of financial reports."  In 2009, the FASB announced the launch of its Accounting Standards Codification ("ASC" or the "Codification"), declaring it to be "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." The Codification, effective as of September 2009, organizes the many existing pronouncements that constituted U.S. GAAP at the time into a consistent, searchable format organized by Topics. The FASB has also established its Statement of Financial Accounting Concept No. 8 "Conceptual Framework for Financial Reporting" ("Concept Statement 8")  (superseding the previous FASB Accounting Concept Nos. 1 & 2) that sets forth, among other things, accounting principles and assumptions that guide recognition, derecognition, and disclosure, as well as the classification and presentation of information in financial statements.

250.    Financial statements filed in any document with the Securities and Exchange Commission are required by Regulation S-X (17 C.F.R. 210.4-01(a)(1)) to conform to U.S. GAAP. Regulation S-X further provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading and inaccurate" despite footnotes or other disclosures. In addition, Regulation S-K (17 C.F.R. Part 229) provides

direction on the form and content of information, other than financial statements, included in registration statements and other periodic filings with SEC.

251.    The GAAP provisions violated by Defendants, and discussed in detail below, were not new or untested provisions of GAAP and did not involve complex accounting issues. Additionally, Defendants committed these GAAP violations repeatedly during the Class Period.

252.    As set forth in Concept Statement No. 8, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concept Statement No. 8, Obj. 2 states:

> The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity. Those decisions involve buying, selling, or holding equity and debt instruments and providing or settling loans and other forms of credit.

253.    Concept Statement No. 8, Obj. 4 addresses the principle that investors "need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources."

254.    Additionally, Concept Statement No. 8, Obj. 5 states:

> Many existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed.

255.    The FASB also sets forth the conceptual framework to be applied to "Information about a Reporting Entity's Economic Resources, Claims, and Changes in Resources and Claims," in Concept Statement No. 9, Obj. 12, stating:

> General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide

information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity.

256.    Additionally, Section 13 of the Exchange Act requires, in part, companies like

Tower to:

devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -

* * *

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

15 U.S.C. § 78m(b).

## Defendants Misrepresented Meadowbrook's Loss Reserves and Net Income

### a.    GAAP Provisions Concerning Loss Reserves

257.    GAAP provides a set of rules for how and when to set loss reserves. Chief among

them is ASC Topic 944, which requires that public insurance companies estimate losses for

unpaid claims and losses should be included in a reserve. Specifically, ASC 944-40-25-1 and

944-40-25-2 address the recognition of insurance claim costs and provide that:

Both of the following shall be accrued when insured events occur:

a. A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer);

b. A liability for claim adjustment expenses; that is a liability for all costs expected to be incurred in connection with the settlement of unpaid claims.

The estimated liability for unpaid claims includes the amount of money that will be required for future payments on both of the following:

c. Claims that have been reported to the insurer;

d. Claims relating to insured events that have occurred but have not been reported to the insurer as of the date the liability is estimated.

258.     ASC 944-40-30-1 ("Liability for Unpaid Claims") addresses a Company's obligation to disclose loss and loss adjustment expense reserves and states:

The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience.

259.     SEC Regulation S-K, Item 303, "Management's Discussion and Analysis of Financial Condition and Results of Operations," (17 C.F.R. §229.303) requires disclosures of known trends affecting operating income as follows:

(3) Results of operations

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

260.     Paragraph 13 of SEC Regulation S-X, Article 7 - Insurance Companies, "Policy Liabilities and Accruals," requires the following disclosures regarding loss reserves:

(a) State separately in the balance sheet the amounts of (1) future policy benefits and losses, claims and loss expenses, (2) unearned premiums and (3) other policy claims and benefits payable.

(b) State in a note to the financial statements the basis of assumptions (interest rates, mortality. withdrawals) for future policy benefits and claims and settlements which are stated at present value.

(c) Information shall be given in a note concerning the general nature of reinsurance transactions, including a description of the significant types of reinsurance agreements executed. The information provided shall include (1) the nature of the contingent liability in connection with insurance ceded and (2) the nature and effect of material nonrecurring reinsurance transactions.

> **b.**    ***Defendants Failed to Set Loss Reserves in Accordance with GAAP***

261.    As alleged above, Defendants deliberately or recklessly understated loss reserves in order to hide Meadowbrook's growing financial risks evidenced by premiums outpacing growth in reserves, financial ratios showing increased leverage, and growing ratio of payments and reserves to earned premiums. Defendants' conduct in this regard constitutes a GAAP violation.

## Defendants Failed to Timely Write Down Goodwill

> **a.**    ***GAAP Provisions Concerning Goodwill Impairment***

262.    Goodwill is created by acquisitions and represents the amount paid by the buyer in excess of the fair value of the net assets being acquired. Under GAAP, goodwill is carried as an asset on the balance sheet and is not amortized but is reviewed at least annually for impairment. If goodwill becomes impaired, a company would be required to write down the goodwill by the amount of the impairment, with a corresponding charge to net income.

263.    As of 2008, companies accounted for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, Business Combinations.[1]   Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition. The excess of the purchase price over the fair value of the net assets acquired is recognized and reported as goodwill, which is an asset

---

[1] Subsequent to the FASB codification in 2009, FASB ASC 350, *Intangibles – Goodwill and Other* provides authoritative GAAP for goodwill impairments.

representing the future economic benefits acquired in a business combination that are not individually identified and separately recognized. In essence, goodwill reflects the going concern value of the business acquired and its expected contribution to the combined enterprise's future earnings growth.  See, e.g., SFAS No. 141 ¶¶101-14.

264.    As of April 2008, companies were required to account for their goodwill in accordance with SFAS No. 142, Goodwill and Other Intangible Assets.  SFAS No. 142 requires that a company review its goodwill to determine if its reported value is impaired. The value of goodwill is impaired when the carrying, or reported, amount of goodwill exceeds its fair value. GAAP requires that goodwill be tested for impairment at least annually, and more often when events or circumstances arise indicating the goodwill could be impaired. See, e.g., SFAS No. 142 ¶¶18-29.

265.    As of 2008, testing for goodwill impairment was a two-step process. The first step in the process was designed to identify potential goodwill impairment while the second step procedures, if step one indicated an impairment, measured the amount of the impairment. In the first step, a company would compare the fair value of a reporting unit to its carrying value on its balance sheet.  If the fair value of the unit exceeded its carrying value, then goodwill was deemed not to be impaired and no further testing was required. However, if the carrying value of the unit exceeded its fair value, then the second step was performed to measure the amount of the impairment. Companies were required to perform goodwill testing at the so-called reporting unit level. See, e.g., SFAS No. 142 ¶¶17-22.

266.    In September 2011, the FASB issued amended guidance, in the form of Accounting Standards Update ("ASU") 2011-8, Intangibles – Goodwill and Other (Topic 350)

Testing Goodwill for Impairment, on how to test goodwill for impairment through use of a qualitative approach.

267.    The amended guidance introduced an optional qualitative assessment for testing goodwill for impairment. Under the new guidance, the Company was still required to test goodwill for impairment annually, and more frequently if indicators of impairment exist. The new guidance continued to require the Company to compare the fair value of a reporting unit to its carrying amount.  However, the Company's management was able to qualitatively assess whether it is more likely than not (defined as having a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount. If that was the case, the Company would have to perform the annual two-step impairment test described in ASU 2011-8 (as codified in FASB ASC 350), Intangibles-Goodwill and Other.  The guidance became effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011, with early adoption permitted.

### b.    Defendants Failed to Impair Goodwill in a Timely Manner

268.    As alleged above, if Meadowbrook had not improperly used reserves to increase its income and if the appropriate reserve analysis had been undertaken, goodwill would have been required to be written off no later than the Company's Q3 2012 expense/loss reserve charge of $31.4 million, which was announced on October 18, 2012. Defendants' failure to do so represents a GAAP violation.

### Defendants Issued SEC Filings Not in Conformity with GAAP and SEC Rules

### a.    Rules Concerning Internal Controls

269.    Beginning in 2002, an entity's principal executive officer and principal financial officer are required under Section 302 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley

Act") to provide certifications regarding its responsibilities in connection with the company's financial statements and internal control over financial reporting.  Additionally, Section 404 of the Sarbanes-Oxley Act requires an entity's management to establish and maintain and adequate internal control structure and procedures for financial reporting:

> Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal control is effective.  (AS 2, Section B)

270.    Defendants Cubbin and Spaun, during the Class Period, were ultimately responsible for adopting, implementing and enforcing sound accounting policies and for establishing and maintaining a system of internal controls sufficient to result in accurate and reliable recording of transactions and the fair presentation of the Company's financial results, including its revenues and expenses, assets and liabilities, loss reserves and cash flows, in the books and records, of the Company.

271.    Defendants Cubbin and Spaun, during the Class Period, were ultimately responsible for executing certifications to Meadowbrook's Forms 10-Q and 10-K acknowledging such responsibilities.    Such certifications, pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002, specifically acknowledged that Defendants Cubbin and Spaun, during the Class Period, and other Meadowbrook senior management, were responsible for establishing and maintaining disclosure controls and procedures, internal control over financial reporting and the fair presentation of the Company's financial statements, including related footnotes, in accordance with GAAP. Such certifications represented that the Company's consolidated financial statements: (a) did not contain any untrue statements of material facts, (b) did not omit any material facts necessary to make the statements in its consolidated financial statements not

misleading; (c) fairly presented in all material respects the financial condition, results of operations, and cash flows, to management's knowledge; and (4) complied with the Securities Exchange Act of 1934. Defendants Cubbin and Spaun further certified that they evaluated the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and deemed them effective.

272.    Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "necessary to an understanding of [the registrant's] financial condition, changes in financial condition and results of operations." 17 C.F.R. § 229.303(a). In 1989, the SEC issued an interpretation providing guidance regarding MD&A, stating that the SEC had long recognized a "...need for narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." This interpretation also stated that the general purpose of MD&A requirements is "...to give investors an opportunity to look at the registrant through the eyes of management... [,]" particularly with emphasis on the registrant's prospects for the future. The SEC again, in December 2003, issued an interpretation that provided additional guidance regarding MD&A, stating that the MD&A requirements are intended to meet three principal objectives:

> [T]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> [T]o enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

> [T]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

273.    Regulation S-K speaks to the importance of disclosures in a company's public filings and provides specific guidance on what the SEC expects to see in such filings. It requires the MD&A to include the following with respect to a company's results of operations, in relevant part:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues..., the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); see also 17 C.F.R. § 229.303(a)(1).

274.    Throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, despite Defendants certifications and other statements to the contrary.

275.    The Exchange Act requires the Company to maintain effective disclosure control and procedures, and effective internal control over financial reporting. The Company's management, including its principal executive and financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end, (b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end, and (c) any changes in its internal control over financial reporting that occurred during each fiscal quarter that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting. 17 C.F.R. §§ 240.13a-15, 240.15d-15. SEC Regulation S-K requires the Company's principal executive and financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations. 17 C.F.R. §§ 229.307, 229.308.

276. Further, in connection with the Sarbanes Oxley Act of 2002, the tenets of which have now been incorporated into Regulation S-K, management of public companies is required to report, at least annually, on the effectiveness of the company's internal controls over financial reporting. The ultimate goal of this process is for company management to express an opinion on the effectiveness of the company's internal control over financial reporting because a company's internal control cannot be considered effective if one or more material weaknesses exist. 17 C.F.R. § 229.308.

### b. Defendants Failed to Maintain Adequate Internal Controls

277. The Company's disclosure controls and procedures, and internal control over financial reporting, were not effective throughout the Class Period. Defendants caused the Company to issue financial statements that were, because of the violations described herein, not in conformity with GAAP and SEC rules. Specifically, the Company's internal controls surrounding loss reserves was foreseeably likely to have resulted in, the material misstatements of the Company's annual and interim financial statements. Thus, Defendants' Sarbanes Oxley certifications regarding the effectiveness of the Company's internal controls were untrue.

278. For the foregoing reasons, Defendants caused the Company's financial statements, during the Class Period, to not present fairly, in conformity with GAAP and SEC rules, the Company's financial position and results of operations.

### PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

279. Throughout the Class Period, Plaintiffs and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's stock. Plaintiffs and the members of the Class would not have purchased the Company's stock at artificially inflated prices if Defendants had disclosed all material

information, including the fact that Meadowbrook was operating with woefully deficient internal controls, resulting in the Company improperly accounting for its reserves and goodwill. Thus, reliance by Plaintiffs and the Class members should be presumed with respect to Defendants' omissions of material information.

280. Throughout the Class Period, the Company's stock traded in an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's stock.

281. The following facts demonstrate that the market for Meadowbrook's common stock was efficient at all time during the Class Period: (a) Meadowbrook's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (b) as a regulated issuer, Meadowbrook filed periodic public reports with the SEC and the NYSE; (c) Meadowbrook regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) Meadowbrook was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

282. As a result of the foregoing, the market for Meadowbrook common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Plaintiffs and the other Class members relied on the integrity of the market price for the Company's stock and are entitled to a

presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

283.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Meadowbrook common stock and operated as a fraud or deceit on Class Period purchasers of Meadowbrook common stock by misrepresenting the value of the Company's business and concealing the significant defects in its accounting, internal controls and reserve process.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Meadowbrook's common stock fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Meadowbrook common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

284.     By misrepresenting its financial outlook, risk exposure, and the value of its assets, Defendants presented a misleading picture of Meadowbrook's business and prospects. Instead of truthfully disclosing during the Class Period that Meadowbrook's income and earnings were being inflated through accounting techniques that violated GAAP and SEC rules, such as failing to establish adequate reserves for incurred losses and loss expenses, and failing to properly value goodwill, Defendants falsely reported Meadowbrook's financial condition and outlook.

285.     The Company's statements concerning its profitability, claims and loss reserving practices, and the fair representation of the value of the Company's assets, as described herein, caused and maintained the artificial inflation in Meadowbrook's stock price prior to and throughout the Class Period, until the truth was revealed to the market.

286.     Defendants' false and misleading statements had the intended effect and caused Meadowbrook's stock to trade at artificially inflated levels throughout the Class Period.

## NO SAFE HARBOR

287.     Meadowbrook's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

288.     To the extent that projected revenues and earnings were included in financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from protection of the statutory Safe Harbor.  *See* 15. U.S.C. §78u-5(b)(2)(A).

289.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made and/or were in actuality statements of then-present fact.

290.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

291.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## SCIENTER

292.     As discussed supra, the misrepresentations and omissions at issue were made knowingly and intentionally by Defendants, who were in possession of contrary facts at the times they made such misrepresentations and omissions.

293.     Specifically, as set forth herein, based upon, among other things, numerous financial metrics, which are critical in the insurance industry and which Defendants had a duty to monitor, Defendants knew at the time of their misrepresentations and omissions that, *inter alia*: (1) the ratio of reserves to premiums began to decline as premiums accelerated, rapidly outpacing growth in reserves; (2) the ratio of gross written premiums as compared to surplus spiked upward, deviating from historical experience, indicating that the Company was underwriting more policies without commensurate increases in its equity cushion, and was therefore more highly leveraged; (3) the disparity between gross and net premiums demonstrated an increased reliance on reinsurance and an altered risk profile; and (4) payments on claims increased relative to premiums, indicating further deterioration in profitability in certain lines of business.

294.     Additionally, the Top Ten Exposure Program, which was in place by November 2011, provided Defendants with contemporaneous information concerning the Company's reserve deficiencies and failure of internal controls, which contradicted their public statements.

295.     Knowledge by Defendants Cubbin and Spaun is further evidenced by their positions as the Company's CEO and CFO, their access to information, which they had a duty to monitor, and also by their having signed the Company's public statements at issue, having been quoted within such statements, having been listed as Company contacts in such statements, and/or having signed SOX certifications accompanying such statements.

296.     Moreover, Defendants Cubbin and Spaun were motivated to deceive by the threat to the Company of the consequences of violating the financial covenants in its credit agreement and from a ratings downgrade by A.M. Best.

297.     Defendants' knowledge and/or reckless disregard of the truth is also based upon, *inter alia*:

(a)     The magnitude of the fraud at issue, which included significant over-inflation of the Company's earnings by over $120 million over a multi-year period, as well as and an over-statement of its goodwill by over $120 million that was restated in a single correction that wiped out over 95% of the Company's total goodwill on its books;

(b)     The fact that the fraud at issue implicates core operations of an insurance company such as Meadowbrook, including the proper measure by which loss estimates and loss reserves are set and the proper treatment of post-acquisition goodwill, with respect to which Defendants had a duty to familiarize;

(c)     The fact that the Defendants violated clear and unambiguous GAAP standards that directly speak to the matters misrepresented;

(d)     The extensive experience of Defendants Cubbin and Spaun in the insurance industry, including their specific experience and expertise regarding SEC reporting and GAAP compliance;

(e)     The fact that Defendants Cubbin and Spaun (i) signed, (ii) were quoted in, and/or (iii) were listed as Company contacts in the Company's public statements at issue, which gave rise not only to a duty to familiarize but also a duty to speak truthfully;

(f)     The fact that Defendants Cubbin and Spaun signed SOX certifications accompanying the Company's Forms 10-Q and 10-K at issue, certifying, *inter alia*, that those

reports did not contain untrue statements of material fact or material omissions and that they had designed effective internal controls, had evaluated such controls, and had reported any changes that could affect such controls;

(g)     The fact that Defendants conducted periodic reviews and assessments of the very reported financial metrics at issue, including reserves and goodwill, which evidences both a duty to inquire and access to information contrary to the publicly-made statements at issue; and

(h)     The complete and total failure of the Company's internal controls to prevent, or otherwise to timely identify and correct, the multi-year fraud at issue, notwithstanding Defendants Cubbin's and Spaun's oversight and repeated certifications of such controls.

## CLASS ACTION ALLEGATIONS

298.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Meadowbrook common stock during the period between February 17, 2009 and February 21, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and Defendants' insurers.

299.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meadowbrook's common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are tens of thousands of members in the proposed Class who are geographically dispersed throughout the United States. Members of the Class may be identified from records maintained

by Meadowbrook or its transfer agent and may be notified of the pendency of this action by mail, using the form(s) of notice customarily used in securities class actions.

300.     Plaintiffs' claims are typical of the claims of the members of the Class, because all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

301.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

302.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about Meadowbrook;

(c)     whether the Defendants caused Meadowbrook to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted with scienter;

(e)     whether reliance upon Defendants' alleged false and misleading statements can be presumed pursuant to the fraud-on-the-market doctrine;

(f)     whether and to what extent the market price of Meadowbrook's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(g)     to what extent the members of the Class have sustained damages resulting from Defendants' violations of the federal securities laws and the proper measure of damages.

303.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<div align="center">

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 of the Securities and Exchange Commission**
**(Against All Defendants)**

</div>

304.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

305.    This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

306.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

307.    Defendants' false and misleading statements and omissions were intended to, and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the market for and market price of the Company's stock; and (iii) cause Plaintiffs and the other members of the Class to purchase the Company's stock at inflated prices.

308.    Defendants were each individually and collectively responsible for making, and authorized to make, one or more of the statements and omissions alleged herein, by virtue of having made false or misleading verbal statements during the quarterly earnings call and during analyst conferences, or by virtue of having prepared, reviewed, commented on, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

309.    As described above, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Meadowbrook stock during the Class Period.

310.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's stock.

311.    In ignorance of the false and misleading nature of the Company's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Meadowbrook stock, Plaintiffs and the other members of the Class purchased Meadowbrook stock at artificially inflated prices during the Class Period.

312.    But for the fraud, they would not have purchased the stock at artificially inflated prices.

313.    The market price for Meadowbrook stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by Meadowbrook and the Individual Defendants, as described above.

314. Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Meadowbrook stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

315. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with Plaintiffs' transactions in Meadowbrook's common stock during the Class Period.

### COUNT II
#### For Violation of Section 20(a) of the Exchange Act
#### (Against the Individual Defendants)

316. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

317. This Count is asserted against the Individual Defendants under Section 20(a) of the Exchange Act.

318. As alleged above, Meadowbrook violated Section 10(b) and Rule 10b-5, promulgated thereunder, by making false and misleading statements in connection with the purchase or sale of securities. This fraudulent conduct was undertaken with scienter because Meadowbrook is charged with the knowledge and scienter of the Individual Defendants and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

319. Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Meadowbrook stock as a direct and proximate result of those violations of Section 10(b) and Rule 10b-5 by Meadowbrook, among others.

320. The Individual Defendants were controlling persons of Meadowbrook within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive

officers and/or directors of Meadowbrook, their ability to approve the content and issuance of Meadowbrook's public statements, and their control over Meadowbrook's day-to-day operations. The Individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

321. The Individual Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts. They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be made.

322. The Individual Defendants did not act in good faith in connection with the conduct at issue in this claim.

323. The Individual Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

324. By virtue of their positions as controlling persons of Meadowbrook, the Individual Defendants are jointly and severally liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act for Meadowbrook's violations of Section 10(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein;

C.      Awarding Plaintiffs and the Class their fees and expenses incurred in this action, including attorneys' fees and expert fees;

F.      Awarding Plaintiffs and other members of the Class prejudgment interest and/or opportunity cost damages; and

G.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 6, 2014

POMERANTZ LLP

By: /s/ Marc Gross
Marc Gross
Matthew Tuccillo
Michele S. Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**ABBEY SPANIER, LLP**
Arthur N. Abbey
Stephen T. Rodd
Jeremy Nash
212 East 39th Street

New York, NY  10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Co-Lead Counsel for Plaintiffs*